WESTERN BANK OF SCOTLAND vs. TALLMAN.

A grant to a railroad company of power to locate and construct a railroad, open books of subscription, &c., confers, by implication, the power to make all contracts and agreements which the execution and management of the work, and the convenience and interests of the company in the construction of the road, may require, so far as the same are not forbidden by any restrictive clause.

In the absence of any restriction, the company, under such implied power, might take a bond for the payment of a stock subscription in installments falling due at specified periods, and a mortgage of real estate to secure the same.

A provision in the charter of such corporation, authorizing the directors to require payment on subscriptions to its capital stock, at such times, in such proportion not exceeding twenty-five per cent. at any one installment, and under such conditions, as they shall deem fit, does not, by implication, prohibit the company from taking such bond and mortgage.

Provisions of that kind are designed for the benefit and protection of such subscribers as may choose to avail themselves of them, leaving the company to make such special contracts with those who do not, as are authorized by the general scope and object of the charter.

The evidence in this cause, introduced to show that a stock subscription was obtained by false and fraudulent representations, *held* not to be sufficient for that purpose.

APPEAL from the Circuit Court for *Rock* County.

This action was brought to foreclose a mortgage executed by the defendants *William M. Tallman* and *Emmeline D. Tallman*, in December, 1855, to secure a bond of the same date given by said *William M.* to the Chicago, St. Paul & Fond du Lac Railroad Company for the payment of $4000, with inter-

est. The bond was given in payment for forty shares of the stock of said railroad, each share being of the nominal value of $100. The company, for a valuable consideration, assigned the bond and mortgage to its president, William B. Ogden, who subsequently, for a valuable consideration, assigned them to other parties, from whom the plaintiff acquired title. The defense was 1. That the railroad company had no power under its charter to take a bond and mortgage of real estate in payment of a subscription to its capital stock. 2. That the subscription was obtained by false and fraudulent representations made to *William M. Tallman,* in behalf of the company, by Mr. Ogden, its president, and who acted as its agent in procuring such subscription. The circuit court found the facts upon the last point as alleged in the answer; and also held that the company was not authorized to receive the bond and mortgage in payment for a stock subscription. Judgment was accordingly rendered dismissing the complaint, and directing that the bond and mortgage be cancelled, and the mortgage discharged of record; and the plaintiff appealed.

*J. Niel,* for appellant.

*J. A. Sleeper,* for respondent.

*By the Court,* PAINE, J. This is another farm mortgage case. The defendant again raises the question of power in the corporation to take such a security, and relies on the absence, in the charter of the railroad company to which this mortgage was given, of some of the general clauses upon which reliance was placed in the former decisions of this court upon the question. The provisions of this charter are more meagre than usual. It grants in the usual form the power to locate and construct the road, open books of subscription, &c., but it does not contain any express grant of the general power to "make all contracts and agreements which the execution and management of the works, and the convenience and interests of the

company, may require," as was the case in the charters heretofore passed upon.

Ĭe have carefully considered the question, whether the absence of this provision requires a different conclusion as to the power of the company to take such securities, and think that it does not. On the contrary, it is the fair result of the authorities upon corporate power, which have been so numerously cited in the former cases that I shall not refer to them here, that general clauses, like the one just quoted, are nothing more than express grants of what would otherwise be implied. That is to say, corporations have the implied power, in executing the general powers conferred by their charters, of using necessary or convenient means of accomplishing the object, unless specially restricted by the charter itself. If this is so, then in the absence of any restriction, a railroad company could take a mortgage to secure the payment for its stock, provided that is a proper and legitimate means of accomplishing the construction of its road. Whether it is or not, we have fully considered in the case of *Clark v. Farrington,* 9 Wis., 306, and *Blunt v. Walker,* id., 334. We there held that the taking of such a security was not an attempt to go outside of the charter and accomplish some object not authorized, but that it was a proper and legitimate means of accomplishing the construction of a railroad. That point being settled, it follows that a railroad corporation would have the implied power of using such means, although its charter contained no general clause authorizing it to make all contracts which the execution of its works or its convenience and interest might require, unless specially restricted. Hence, in either case, whether the charter contain such general clause or not, the question is whether there is a restriction? For if there is a special restriction, even though the charter contain such general clause, the special restriction would govern, in accordance with the rule of construction, that special provisions relating to a particular subject control general ones to which they are repugnant.

And the question whether any particular provisions amount to a restriction, must also be decided in the same way, whether the charter contain the general clause above referred to or not.

There are no provisions in this charter which it is claimed either express or imply any prohibition, except those authorizing the opening of stock subscription books and pointing out how payment of such subscriptions may be required. It is claimed that these prohibit any other possible mode of becoming a stockholder, or paying for stock. But the same argument was made in respect to provisions substantially similar in the case of *Clark vs. Farrington*. And to make the decision there made, we necessarily held that these provisions did not amount to a prohibition against any other mode of becoming a stockholder. It follows necessarily from the reasoning in that case, that if a railroad company could sell its stock for the right of way, for lands for depot purposes, for iron or anything essential to the accomplishment of its purpose, it might do so. Such has always been the practice of railroad companies. And though their practice cannot make the law or enlarge their powers, it is a significant fact that, although such a practice has so generally prevailed, not a case has been cited deciding that they could not thus dispose of their stock. And yet, in all such instances, the stock is not subscribed for and paid in installments called in by the directors, as provided in the charters. Such provisions are designed for the benefit and protection of such subscribers as choose to avail themselves of them, leaving the company, however, to make such special contracts with those who do not, as are authorized by the general scope and objects of the charter.

Having, then, already held that provisions of the kind now under consideration do not imply such a prohibition as is here claimed, and being still satisfied with that conclusion, we must hold that there is no such restriction in this charter. It follows that this company had the same power with those whose charters have formerly been considered, to receive this security.

The only remaining question is that of fraud, and that is a question of fact. Instead of a negotiable note, a bond was given with this mortgage, so that although it has been transferred to *bona fide* holders for value, the defense of fraud, if fraud existed, is still open. The fraud alleged is, that the defendant was induced to take the stock for which this mortgage was given, by the false representations of Ogden, the president of the railroad company, in respect to the indebtedness of the company. The defendant claims that Ogden represented that the company did not owe a dollar, while in fact it was indebted to the amount of several millions. There is much proof upon the question what Ogden did represent, and what was in fact the condition of the company. As to the latter point, there is no dispute, upon the evidence, that the company was in fact indebted from two to three millions of dollars. The only question then is, whether Ogden falsely represented that it was not indebted, and thereby induced *Tallman* to take the stock.

*Tallman* himself, and one or two other witnesses, testify in effect that he did so represent. Ogden denies it, and there are several considerations which so strongly corroborate his denial, that we are certainly unable to say that any such false representations are proven with that degree of clearness which is requisite to establish fraud. In the first place, there is a considerable degree of hesitancy and uncertainty in the statements of those who testify that such representation was made. *Tallman* himself says, in one part of his testimony: "Mr. Ogden did state, *my impression is now almost positive*, that the road owed nothing." This language is significant. It is true he previously stated that Ogden had represented the same thing in a former conversation, without disclosing that his testimony was based upon a mere impression. But when he came again to this point, which constituted the most important fact to be established, he said his "impression" was *then* "almost positive." That implies that his recollection as to that statement was on-

ly an impression, and indicates a struggle of the memory to fortify and strengthen that impression. Dimock's evidence is also very general and uncertain. He says, " my recollection is, that Mr. Ogden made the thing out *to be in very good shape* The way they had got it fixed, *they were pretty well freed from debt.*" Also, that the bonds of one of the old companies "had been, *or were being,* converted into stock of the consolidated road," &c. Now in connection with such forms of statement as these, it is material to remember, what is undisputed, that Ogden did spend some time in Janesville trying to persuade the citizens to take stock. He did make detailed and lengthy statements in respect to the condition of the old companies and the new ; the efforts that were being made and had been made to get rid of some claims against the old companies ; and he gave his views as to the effect of the sale of one of the old roads on a mortgage, and also in regard to the value of the new stock and the future prospects of the new company. It is not impossible, or even improbable, that even intelligent business men should, after the lapse of several years, in their recollections of such statements and persuasions, confound matters of opinion with representations of facts ; and, from a general recollection that, after statements were made in respect to the indebtedness of a road, it was still claimed to be in a prosperous condition, they may be able to derive an "impression almost positive" that it was represented to be out of debt. Considerations of this kind, though material, are not decisive. They only show the liability to err, the uncertainty of human testimony as to statements made long before, an uncertainty proverbial in the law.

But there is one leading, important fact, established by the testimony of several witnesses, and not denied by any, which, in addition to these considerations, renders it impossible for us to believe that Ogden represented to *Tallman* that the company was out of debt. That is the fact that, at the same visit to Janesville, and before some of the conversations with *Tallman,*

he caused a public meeting to be called, to advance the same objects he had in view in his solicitations of *Tallman* and others, and at that meeting he gave a public detailed statement of the condition of the road, showing an indebtedness of from two to three millions of dollars, which was according to the fact. It is utterly incredible that after this he could have attempted to deceive *Tallman* or any body else there, by representing that it did not owe a dollar. Concede that *Tallman* was not at the meeting: it is not probable that Ogden knew that fact. Or even if he did know it, he would have every reason to suppose that *Tallman* had conversed, or would converse, with those who were present. So that, if he had represented to him that the company was out of debt, he would have every reason to expect that *Tallman* would be able on the spot, or immediately afterwards, to brand him as a liar, and thus defeat the accomplishment of the very objects for which he was laboring. The counsel for the defendant concedes to Ogden such great business talent that he had obtained the appellation of "Railroad King." But even the most stupid rascality, if it had conceived the design of defrauding parties into taking stock, by false representations that the company was out of debt, would not have called a public meeting, urging its expected victims to attend, and there informed them that the company owed from two to three millions of dollars. Such public statements are incompatible with the existence of such fraudulent design or attempt. It is wholly improbable that both could have existed. We are satisfied that such public statements were made, and are consequently obliged to reject the other statement as unfounded.

The whole defense of fraud hinges upon the question whether Ogden made those representations, and as we are compelled to believe that he did not, we must find this defense unsustained.

The judgment is reversed, with costs, and the cause remanded with directions to enter judgment for the plaintiff according to the prayer of the complaint.