State ex rel. Keenan vs. The Supervisors of Milwaukee County.

## STATE ex rel. KEENAN vs. THE SUPERVISORS OF MILWAUKEE COUNTY.

CONSTITUTIONAL LAW. *Uniformity of county government — Art.* iv, *sec.* 23 *of State Constitution — ch.* 372, *P. and L. Laws of* 1869.

Chapter 372, Pr. and L. Laws of 1869, which appoints three commissioners "to superintend the erection of a court-house in the county of Milwaukee," is invalid, being in conflict with section 23, art. iv of the state constitution, which declares that "the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable."

APPLICATION for a *Mandamus.*

Section 23, art. iv of the constitution of this state provides, that "the legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable." Section 2, ch. 13 of the Revised Statutes, provides that "each organized county within this state shall be a body politic and corporate, and as such shall be empowered * * * 4. To make all contracts and do all other acts in relation to the property and concerns of the county, necessary to the exercise of its corporate or administrative powers." Section 6 declares, that "the powers of the county, as a body politic and corporate, can only be exercised by the board of supervisors thereof, or in pursuance of a resolution by them adopted." Section 27 empowers the board of supervisors of each county, at any regular meeting, to do various acts, including the following: "3. To build and keep in repair county buildings."

In September, 1868, a contract was entered into between the board of supervisors of Milwaukee county, acting in behalf of the county, and one Charnley, for the erection and construction by the latter of a court-house for said county. At the next session of the legislature, an act was passed (approved March 10, 1869, and pub-

lished as ch. 372, Private and Local Laws of 1869), which contained the following among other provisions : Section 1 declares that *Matthew Keenan*, and two other persons there named, of the city and county of Milwaukee, are thereby " constituted a board of commissioners in and for" said county, "whose duty it shall be, in conjunction with the architect and superintendent mentioned in" the above-named contract, "or the successor of the said architect and superintendent, as provided for in said contract, to superintend the erection and construction of the said court-house under the said contract, as now therein provided to be done by and on the part of the said county, or any committee of the said board of supervisors;" and said board of commissioners are thereby authorized, and it is made their duty, "in conjunction with the aforesaid architect and superintendent, or his successor, * * * to reject and to cause to be removed all materials furnished for said court-house, and all work that shall be done thereon under said contract, which shall be unsuitable therefor, or which shall not have been furnished or done in accordance with the terms of the aforesaid contract, and to cause the same to be replaced by other material or work which shall be agreeable to the terms of said contract," etc.    Section 2 declares that said board of commissioners are thereby " subrogated to and invested with all the powers and duties which are now or shall hereafter be vested in the present or any subsequently appointed committee on public buildings" of said board of supervisors, in relation to the erection, etc., of said court-house.    Section 3 forbids any change in the plans and specifications accompanying said contract, except by the authority of said board of commissioners, and empowers them, with the consent and advice of the board of supervisors, to determine whether any and what *extra* materials should be furnished, or *extra* work done, on such court-house. Section 5 provides that each of said commissioners,

before entering on the discharge of his duties as such, shall give a bond to the county, conditioned for the faithful discharge of those duties. Section 6 declares that, if said commissioners need an office for the transaction of their business, the board of supervisors shall "provide and suitably furnish convenient and suitable rooms" for that purpose at the expense of the county. Section 7 provides for the compensation of the commissioners at the expense of the county.

This was an application by the commissioners above named for a *mandamus* to compel the board of supervisors of said county to provide them with suitable rooms for an office. The respondents moved to quash the alternative writ; and, without waiving the motion, they were allowed to make a return to the writ, to which return the relators demurred for insufficiency.

*C. K. Martin*, district attorney, with *E. G. Ryan* and *James G. Jenkins*, for the motion to quash, contended, 1. That ch. 372, Pr. and L. Laws of 1869, was in violation of section 9, art. xiii, of the state constitution.* In support of this objection they argued, (*a*) That the commissioners provided for by that act are *county officers*, and that, by the first sentence of said section, they must be elected by the electors of the county, or appointed by some of the county authorities. (*b*) That if their appointment should be supposed to fall under the provision of the last sentence in said section, still the power of the legislature to direct how the appointment should be made is not a power in the legislature itself to make the appointment directly; such

---

* This section reads as follows : " All county officers whose election or appointment is not provided for by this constitution shall be elected by the electors of the respective counties, or appointed by the board of supervisors or other county authorities, as the legislature shall direct. All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers, whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed as the legislature may direct."

appointment not being a legislative but an executive function. *Attorney-General v. McDonald*, 3 Wis. 805; *State v. Kennon*, 7 Ohio St. 547. 2. That the act was in violation of sec. 23, art. iv, of the state constitution, because it destroys without necessity the uniformity of the system of county government previously existing, by taking from the board of supervisors of Milwaukee county a power which remains in the boards of supervisors of other counties. 3. That the act was void because it impaired the obligation of the contract between the county and Charnley for the erection of the court-house; and this chiefly in three respects: (*a*) In that the power of rejecting materials and work was by the contract to reside in the architect and superintendent appointed by the board of supervisors, while by said act that power is to be exercised by the commissioners "in conjunction with" said architect. (*b*) In that, by the contract, all changes in the plans and specifications were to be made by a building committee of the supervisors, while by the act they were to be made by the commissioners with the consent and advice of the supervisors. (*c*) In that, by the terms of the contract, work and materials could be rejected only when they were "unsuitable *and* not furnished or done in accordance with" the contract, while by the act they might be rejected merely on the ground that they were deemed by the commissioners "unsuitable," although strictly in accordance with the contract.

*O. H. Waldo* and *J. R. Brigham*, for the relators, in answer to the objection founded on sec. 9, art. xiii of the constitution, argued, (1.) That the commissioners in question are not "county officers" within the meaning of that section, and that those only are "officers," in the sense of the constitution, who "exercise continuously, and as a part of the regular and permanent administration of the government, any important public powers, trusts, or duties." *State v. Kennon*, 7 Ohio St. 556–562; 20 Johns. 493; *Sheboygan v. Parker*, 3 Wall.

96; *United States ex rel. Noyes v. Hatch*, Burnett's Reports for 1842-3, pp. 22, 28; 3 Greenl. R. 482; *Commonwealth v. Sutherland*, 3 S. & R. 145, 149, 150, 154, 155; *Commonwealth v. Bussier*, 5 id. 457; *Shepherd v. Commonwealth*, 1 id. 1. In support of this view, and as showing the construction established by usage, counsel cited numerous acts of the legislature appointing commissioners for various purposes, such as laying out roads, making canals, improving rivers, borrowing money for municipal corporations, issuing their bonds, and subscribing to the capital stock of railroads, etc., etc., including two acts (Laws of 1853, ch. 92, and ch. 377) appointing commissioners for the erection of courthouses. For the practice of the legislature of New York, under their constitution of 1846 (from which the section in question in our own constitution is borrowed), they referred to the citations made by Mr. Field, *arguendo*, in 25 Barbour. And as to the weight due to contemporaneous construction, they cited *McKeen v. DeLancy's Lessee*, 5 Cranch, 22; *Stuart v. Laird*, 1 id. 95; 1 Kent's Comm. 465. (2.) Counsel contended that even if the commissioners are county officers, their office having been created by law since the adoption of the constitution (*People v. Pinckney*, 32 N. Y. 384, 385), they may be appointed under the last clause of said section, as the legislature may direct (*People v. Draper*, 15 N. Y. 532, 537-539, 553; *People v. Batchelor*, 22 id. 128; *People v. Woodruff*, 32 id. 355, 365; *People v. Pinckney*, id. 377, 384, 385, 392, 393); and that an appointment directly by the legislature itself is valid under this clause. *People v. Woodruff*, *People v. Batchelor*, and cases cited by Mr. Field, *supra*. 2. As to the objection founded on sec. 23, art. iv, counsel reasoned as follows: Before the adoption of the constitution there were two different systems of county government — one with and the other without town organization. This provision was obviously framed solely for the purpose

of correcting the evils arising from that diversity, and to secure, in that respect, such uniformity as is practicable. The language does not require absolute similarity in all particulars.   The one general system is to be "as nearly uniform as practicable," which implies that the framers of the constitution contemplated the necessity of variations, and so they left it to the legislature to judge of the necessity of such departure from uniformity, simply confining them to one general system.   The existence and general uniformity of the system would not be disturbed, even if one county were deprived of the power to build a court-house, or if the entire business of building were conferred upon commissioners.   The general system of local county government would go on all the same in such a case; just as it did in Washington and Ozaukee counties, where commissioners bought sites and built court-houses; and just as it did in Sheboygan and Fond du Lac counties, where commissioners built a harbor, and where other commissioners aided to build railroads, and where still other commissioners bought a farm and built a poor-house.   The power of the county to erect a court-house is not one of the continuous, regular, usual and material powers necessary to the existence of the town and county system..   BROWN, J., in 15 N. Y. p. 569.   "As uniform as practicable" does not mean as uniform as is physically and absolutely possible.   That clause was introduced to give some degree of flexibility.   The framers knew that differing circumstances would render absolute uniformity impracticable; and, therefore, they left a discretion to the legislature, limiting them to one system, which must be as uniform as they should find it practicable to make it. Experience has shown the wisdom of preserving this element of flexibility.   It would be *possible* to provide precisely the same offices and the same officers and the same buildings, etc., for every county, but it would not be rational or practicable to do so.   In one county,

whose business is small and whose offices are simple, a county auditor would be quite useless, while in another, embracing a city, such an office might be indispensable. In one a county comptroller might be necessary; in another, quite superfluous. In one a board of health and quarantine officers might be required for the public safety, while in another the creation of such functionaries would be absurd. In one a harbor-master or pilot might be required, while, in another he would find no employment. In older counties, all the machinery of courts and of county government is essential, while in newly-settled counties that machinery would be burdensome, and it is far more practicable — in fact, necessary — to attach them to older ones for judicial or county purposes. In one, a court-house and county buildings are needed; in others, they are not. The constitution is flexible at this point. It is left to the legislature, in its discretion, to provide for these varying exigencies as they arise; and it is not for the court to review the exercise of that discretion, so long as there is left, in good faith, one general system of town and county government, substantially uniform throughout the state. The constant and hitherto undisputed practice of our legislature and people should control the interpretation on this point also. Finely-spun theories and nice criticisms of words, in constitutional construction, should not override the uniform judgment and practice of a whole people, and of all departments of the government, commencing with the very date of the formation of the constitution. 3. As to the objection that the act impairs the obligation of the contract with Charnley, counsel argued that all the provisions of the contract which were affected by the act were inserted for the benefit of the county only, and the other party could not complain; that the object of the act, and of all its provisions, was not to defeat the contract, but to secure its full performance; that the supervisors could not delegate to a com-

mittee or an architect the right to make new contracts, in case of changes in the plan and specifications (Cooley's Const. Lim. 204; *Thompson v. Schermerhorn*, 6 N. Y. 92; 2 Cal. 524), and that they could not, by any contract concerning their own powers or duties, prevent the legislature from exercising, at any time it should see fit, whatever power it might otherwise possess in changing the modes of administering the affairs of a county.

The following opinion was filed at the June term, 1869:

PAINE, J.    This was an application for a *mandamus* to compel the *Board of Supervisors of Milwaukee County* to comply with the requirements of chapter 372 of the Local Laws of 1869, in respect to furnishing the commissioners, whose appointment is provided for in that act, an office and other means for discharging their duties.    The object of the application is to test the validity of the act, which is questioned upon several grounds.    Among others it is objected, that it violates the uniformity of the system of county government, and is, therefore, in conflict with section 23 of article iv of the constitution.    That section is as follows: "The legislature shall establish but one system of town and county government, which shall be as nearly uniform as practicable."    I can see no answer to this objection. The powers which this act attempts to confer on these commissioners relate to the building of the court-house for that county.    It is clear that they are powers which would otherwise belong to the county board, and that they are included among the general powers conferred on all county boards to "build and keep in repair county buildings."    The act, then, so far as relates to this particular county building, is a substitution of the commissioners for the board of supervisors, so far as the powers of the commissioners extend.    This general power to build and keep in repair the county buildings is one of the most important in the county government. It is of such vital necessity and of such paramount

importance, that it can scarcely be denied that it is an essential element of the system itself. And the court-house, being the place where justice is administered for the county, is not only on that account the principal county building, but it usually contains, as it will in this case, nearly all the public offices of the county; so that the power to build the court-house is, really, in this instance, almost equivalent to the power to build the county buildings.

If it is true, then, that this power is of such a character as to constitute an essential feature in the system of county government, does the act in question conflict with the provision requiring this system to be as nearly uniform as practicable? It seems impossible to say that it does not. It takes an important general power of the county board in that county, and confers it upon special commissioners designated by the legislature. That it is not a uniform system to provide that in one county the power to build the county buildings shall be vested in special commissioners selected by the legislature, while in other counties the same power is vested in the boards of supervisors elected by the people, is obvious. It is equally obvious that it is not as uniform as practicable, because it is self-evident that this power might be vested in the county boards in all the counties. Independent of this act, it was so vested in fact. There was, under the existing law, complete uniformity. The same board was clothed with the same general powers of county government in all the counties. A confession that such uniformity was not only practicable, but actually existed, is implied by the very enactment of this act; for its sole object was to change that state of things, and to withdraw from the county board of Milwaukee county a portion of the powers which it previously held in common with all the other boards of the state. Testing this act, therefore, by the provision of the constitution referred to, according to its plain and natural meaning, I cannot reconcile them.

But it is said that this provision should be construed by the light of the object which the framers had in enacting it; that there prevailed in territorial times different systems of town and county government in different parts of the territory; and that the only object of this clause was to prevent that in the state. But the answer to this is, that if such had been the only object, it would have been fully accomplished by the first part of the clause under consideration. When the framers of the constitution had said that the legislature should establish but one system of town and county government, that would have fully remedied the evil. But they did not stop there. They added, that this system should be as nearly uniform as practicable. In this they must have aimed at the evil of special legislation. That this is a great and serious evil, every one at all familiar with legislative experience knows. The members are constantly annoyed by persons among their constituents who are anxious to amend the laws regulating their local concerns. The local member naturally yields to the local pressure, whether in harmony with his own views or not; and the legislature, usually without much consideration, enacts such local measures as the local members may ask. And thus the public time and money are spent in enacting laws that are frequently of an unwise and improvident character. It is an evil that there have been many efforts made to check; and I can conceive of no other motive for the clause in the constitution requiring the system of county and town government to be as uniform as practicable, except to prevent such special legislation, varying the system in different localities, as might not amount to an actual destruction of its unity.

If such was its object, the act in question is as clearly within the spirit of the clause as it is within the letter; for there could be no worse system of special legislation, than for the legislature to substitute special com-

missioners to exercise some portion of the general powers of the county board on particular occasions. With such a practice established, there would be no end of occasions for the exercise of the power; and if it may be exercised with impunity, the provision of the constitution under consideration is of no effect whatever. The entire powers that are exercised in county and town government might be withdrawn from the proper boards, and distributed in fragments among special commissioners selected by the legislature to exercise them in single instances.

And whatever force there might be in the argument, made in answer to another objection to this law, that these commissioners were not to be regarded as county officers, because their functions were only transient and not permanent, yet that fact would not prevent the act from violating the uniformity of the system which the constitution requires. For if the power is of such a character, that to bestow it permanently on special commissioners would violate that uniformity, then it would equally violate it to bestow the power transiently on new commissioners as often as there was fresh occasion for its exercise. To hold otherwise would enable that to be done by indirection which could not be directly accomplished.

But it was said, that the clause requiring uniformity was designed to relax the imperative character of the provision requiring a single system, and to allow legislation, which that alone would not have authorized. I cannot so regard it. Certainly, many variations might be imagined, in applying a system of county and town government in different localities, which would not be of such a nature as actually to destroy its unity. At the same time, they might break its uniformity. Changes of a slight character might accomplish the latter result, while nothing less than a departure from

what constituted the essential elements of the system, as such, would accomplish the former.

But the constitution requires the system to be only as uniform as practicable. And this, it is said, does not require absolute uniformity, nor that the same state of things should exist in all the counties. This is very obvious. A uniformity that is impracticable is not required; but, as already shown, that here in question is practicable. And the ' different boards of different counties may, in the exercise of their general powers of county government, produce very different results. But all that does not touch the unity or uniformity of the system. The legislative and administrative body of each county is the board of supervisors. They are clothed with the same general powers of county government. This is a single and uniform system. But, in exercising those general powers, they may produce results as various as the judgment and wisdom of the individuals composing them.

It was suggested that geographical differences in different counties might require differences in applying the system of county government. If so, then a uniformity as great as those differences permitted would be all that was practicable, and therefore all that was necessary. But it was scarcely suggested that any geographical peculiarities in Milwaukee county disabled the board of supervisors from exercising these powers. Because some departures from absolute uniformity may be sustained under this clause, it will not do to say that, therefore, all departures can be, and that the provision itself is capable of no practical enforcement. Its language is positive and imperative, in no wise like that of provisions designed to refer questions wholly to the judgment and discretion of the legislature. When a case arises under it, where the question, whether a greater uniformity were practicable or not, is doubtful, as in all other such cases, the law would receive the

benefit of the doubt. But where, as in this case, the act seeks to disturb a condition of absolute uniformity already existing, there is no room for doubt, and it cannot be sustained without, in effect, nullifying the provision of the constitution. If the power conferred on these commissioners were something new and unusual, not constituting any part of the ordinary general powers of county government, like that of issuing bonds in aid of railroads, sustained in *Sheboygan County v. Parker*, 3 Wall. 93, I should regard it as a different question. But I rest my conclusion upon the fact that the powers here conferred are a part of the ordinary general powers of county government, existing by the general statutes in all county boards, and that the act attempts to withdraw them from the county board in a particular instance, and confer them on a special body selected for the occasion.

In the absence of a constitutional provision, the whole matter would of course be subject entirely to legislative control. And the practice of legislatures in other states and in this, concerning matters not governed by any such provision, can have no material bearing on the question. If there have been one or two instances in this state, where acts have been passed appointing commissioners to build a court-house, they have been passed and executed without question, and do not constitute any such practical construction as to justify the court in failing to enforce what seems to it the plain meaning of the constitution.

The respondents moved to quash the alternative writ; but, that all the questions in the case might be presented to the court at once, a return was filed, to which there was a demurrer by the relators, with a stipulation that this should not be a waiver of the motion. It is immaterial whether the motion is granted, or the demurrer to the return overruled, on the ground that the relation is itself defective in substance. But, as the question upon

which we have disposed of the case properly arose upon the motion, without considering the return, we will direct that the motion to quash the alternative writ be granted.

*By the Court.* — So ordered.

A motion for a rehearing was denied at the January term, 1870.