[No. 4684.]

## THE PEOPLE OF THE STATE OF CALIFORNIA v. THE BOARD OF SUPERVISORS OF THE COUNTY OF SAN LUIS OBISPO.

WRIT OF MANDATE.—An act requiring and empowering a Board of Supervisors, as soon as practicable after its passage, to issue county bonds to raise money to be used in improving roads, and providing that the bonds shall be sold to the highest bidder after notice given by publication, and further providing that immediately the county treasurer shall transfer one-half the road-fund of the county over to the fund created by the act, to be repaid by money derived from the bonds, so that no delay may occur in the work, is mandatory, notwithstanding a provision in the act giving the board power to reject all bids for the bonds.

IDEM.—The power given the board to reject all bids is a power to be used to effectuate, not to defeat the legislative will.

POWER OF LEGISLATURE.—The Legislature has the constitutional power to pass an act requiring Boards of Supervisors of counties to issue and sell county bonds for the purpose of raising money to improve roads in a county.

IDEM.—The clause in the Constitution requiring the Legislature to establish a system of county governments which shall be as nearly uniform as practicable, does not deprive the Legislature of such power.

PARTY PLAINTIFF.—The people of the State, without a relator, may bring an action to compel, by writ of mandate, the Board of Supervisors of a county to issue bonds to raise money to improve roads, when there is an act of the Legislature requiring the bonds to be issued.

APPEAL from the District Court, First Judicial District, County of San Luis Obispo.

After the passage of the act (Laws, 1873-4, p. 436) for the issuance of bonds to aid in the construction of roads, the Board of Supervisors of San Luis Obispo County refused to issue the bonds. This was an application for a writ of mandate requiring them to do so. The suit was brought by the Attorney-General in the name of the State. The court below gave judgment that the writ issue. The defendants appealed.

The other facts are stated in the opinions and dissenting opinion.

*W. W. Cope and A. A. Oglesby and R. C. Bouldin*, for the Appellants.

The act is merely enabling or permissive, and not mandatory. The first section is expressed in the language of a command, but the discretion vested in the board by other provisions deprives the act of any mandatory effect. Section 8 provides that the bonds shall be sold to the highest bidder, after the publication of a notice inviting proposals for the purchase thereof, but gives the board discretionary power in the rejection of bids. The last clause of the section is as follows: "The board has power to reject any or all bids, and no bond must be sold for less than ninety cents on the dollar, par value; but the board may sell said bonds, or any part thereof, at a rate not less than ninety-six cents on the dollar, par value, without any notice, and at private sale."

This clause is decisive of the construction of the act. It fixes the minimum price of the bonds, but does not require them to be sold at any price. On the contrary, it authorizes the board to exercise its judgment and discretion as to whether they should be sold or not. This is the necessary effect of the power given to reject bids.

The application is in the name of the people of the State, without the intervention of a relator. We are not aware of any authority for such a practice. The Code provides that the writ must be issued upon affidavit, on the application of the party beneficially interested. (Code C. P., Sec. 1086.) An affidavit is required in all cases, and where the application is in the name of the people, some competent person must make the affidavit and appear in the proceedings as relator or informant. His interest must be shown by the affidavit. This is the settled practice throughout the country, except as otherwise provided by statute. (High's Extraordinary Legal Remedies, Secs. 430–439.)

*J. L. Love, Attorney-General, and William J. Graves*, for the Respondent.

The Code nowhere requires a relator to be named, and

the practice is to be tested by the Code alone.  This application, though in the name of the people, is made upon affidavit of a private individual.  This is the correct practice. (*People* v. *Pacheco*, 29 Cal. 210; *Linden* v. *Alameda Co.*, 45 Cal. 6; C. C. P., Sec. 1086.)

The writ is a civil remedy, and is awarded in all cases where a duty resulting from an office is not performed by the officer, at the instance of the party beneficially interested.  Here the people are beneficially interested.  It is not necessary to show that the individual making the affidavit has any interest in the performance of the act sought to be enforced. (High's Extraordinary Legal Remedies, Sec. 431; *Pike* v. *The State*, 11 Ill. 202; *Heffner* v. *Com.*, 28 Penn. St. 108; *Sanger* v. *Commissioners of Kennebec*, 25 Maine, 291.)

The act under consideration (Laws, 1873-4, p. 436), is clearly mandatory on the Board of Supervisors of San Luis Obisbo County.  It leaves them, so far as the issuance of the bonds is concerned, absolutely without discretion. They are "empowered and required" by the first section to issue the bonds, and the eighth section says plainly they must sell them.  The whole scope, web and woof of the act shows command on the part of the Legislature speaking to its creature, the Board of Supervisors, requiring them to do certain things.  The power given to the board to reject bids does not excuse them for a total failure to act.

The act to be done, concerning as it does the public at large, even were the board merely authorized to do it, this remedy might be invoked to compel its performance. (*Napa V. R. R. Co.* v. *Napa Co.*, 30 Cal. 435; *Robinson* v. *Butte Co.*, 43 Cal. 353.)

Mr. Chief Justice WALLACE delivered the following opinion:

1. One of the provisions of the act is that the county surveyor "must immediately commence and must diligently prosecute the work on said road to completion within as short a time as practicable after the passage of this act." Another provision is as follows: "And in order that no de-

lay may occur in the prosecution of the work on said road, the county treasurer of said county must immediately, upon the passage of this act, transfer one-half of the general road fund of said county remaining in the treasury over to said 'Cuesta Road Fund,' and pay the same out to said surveyor in the manner hereinbefore provided." The act further provides that those moneys are to be replaced in the general road fund by funds to be derived from the sale of the bonds in question. These important steps to be taken by the surveyor and treasurer immediately upon the passage of the act, "in order that no delay may occur in the prosecution of the work on said road," are wholly inconsistent with the exercise of discretion by the board as to whether the work should be done at all. The power expressly conferred upon the board, in the eighth section of the act, "to reject any or all bids," is not inconsistent with this view. It is a power to be used to effectuate, not to defeat the legislative will, plainly expressed in the statute; the mere power to conduct the sale of the bonds in such a manner as will insure the best terms in the interest of the people.

2. The constitutional authority of the Legislature to enact statutes such as this has been so uniformly maintained that, in my opinion, it is not now open to question. The other points made by counsel for the appellant were disposed of at the hearing, and need not be further noticed.

Judgment affirmed. Remittitur forthwith.

Mr. Justice CROCKETT concurred specially in the judgment.

RHODES, J., concurring:

The question whether section 4 of Article XI of the Constitution is mandatory or merely directory, and addressed to the judgment and discretion of the Legislature, is one of great importance, for on its solution depends the validity of a large number of statutes, some of which are being acted upon every day. The language of the section is as follows: "The Legislature shall establish a system of county and town governments, which shall be as nearly uniform as practicable throughout the State." The powers to

be conferred upon such governments are not prescribed in the Constitution; and it cannot be said that they acquire, by reason of their organization, any necessary or inherent powers, or that they possess any particular powers, because they have usually been conferred by the statutes of other States in organizing county governments. The question has not been expressly determined by this Court; but there are many cases in which the validity of legislation, like that in question, has been assumed by the Court, in which it might be said, if it could be said in any case, that the question has been determined by necessary implication. If any force is due to what is sometimes called legislative construction, there is an abundance of it to be found in the statutes of this State, commencing almost at the foundation of the government. Such statutes are so numerous, and so many have been passed at each session of the Legislature since A. D. 1850, that it is clear that the Legislature has always regarded the section now before us as merely directory.

The statutes of 1850 created a system of county governments for all the counties, and vested the governmental powers in the Courts of Sessions; and among those powers was that of laying out and maintaining roads, and auditing and providing for the payment of claims against the counties. Yet at the session of 1851, an act was passed for the laying out of a road and providing the means for its construction; and an act was also passed for the issuing of bonds to pay the orders drawn upon the treasury of a particular county. From time to time general acts have been passed, providing for boards of supervisors, and after many special acts, by which the county governments of certain counties were vested in the Courts of Sessions, a general act was again passed for the election of boards of supervisors in each of the counties. There have also been passed from time to time general laws relating to the county governments, their powers and duties, and subsequently special acts relating to the same subjects, and applicable only to specified counties, have been passed, by which the county governments and the powers and duties of the boards of supervisors and other county officers have been materially changed, en-

larged or restricted. Some of these laws may be enumerated as showing the practice of the government. General laws have been passed for the location or relocation of the county seats; for the erection of county buildings, and to provide the funds therefor; for the support of the indigent sick; for the establishment and licensing of ferries; for the erection and maintenance of toll-bridges; for the granting of the right of way for turnpike and other roads; for the granting of aid to railroads; for the laying out, opening and maintaining roads, acquiring the right of way therefor, and providing the mode in which the funds necessary therefor should be raised. Special acts upon each of these subjects have been passed at almost every session of the Legislature. Under such acts, bonds have been issued for the erection of county buildings; for the support of the indigent sick; in aid of railroads; for the construction of roads; to fund the indebtedness of counties; and for other purposes, included within the powers conferred upon the county governments by the several general laws then in force. The title of the county to the land upon which the court-house and other county buildings stand, is, in many instances, dependent upon the validity of special acts. The right of way for some of the turnpikes and other toll-roads, and the right of private parties to maintain toll-bridges and ferries, is also dependent, in many cases, upon the validity of special acts; and the same is true of many classes of county bonds issued under the authority of special acts.

Special acts have also been passed, authorizing the issuing of warrants or other orders on the county treasury; for the appropriation of money; for the levy of special taxes for county purposes; providing the number of members of the board of supervisors, their terms of office and compensation, and legalizing the orders of the board of supervisors, and the acts of other county officers, while there were general laws in force providing for all the subjects to which the special acts related.

Several general road laws have, at different times, been adopted, and some of those laws have specially excepted from their operation certain counties; and it may safely be

said that, after the lapse of two years from the organization of the government, special road laws have always been in force in some of the counties, providing modes differing in material respects from those of the general law for laying out roads, acquiring the right of way therefor, opening and maintaining them; and since the adoption of the codes the courts have given effect to, and, by implication, have recognized the validity of several of those special laws.

Among the most striking instances of special laws are the laws consolidating the city and county governments of San Francisco, and the several acts conferring further powers upon the board of supervisors. If it be held that the constitutional provision requiring the establishment of a system of uniform county governments is mandatory, I can conceive of no ground upon which the proceedings and orders of the board of supervisors of the city and county of San Francisco can be upheld.

It is unnecessary to notice further the legislation of this character. The practice of the Legislature in passing special laws in respect to matters relating to the county governments, which were provided for by general laws, has so long been acquiesced in by all the departments of the State government, and the validity of the special laws has so frequently been impliedly upheld by the courts, that I am not prepared to say that the construction thus given, of the constitutional provision in question, is incorrect; and, in view of the long acquiescence in that construction, and of the injuries which are liable to accrue from a different construction, I am clearly of the opinion that the section in question should be construed as directory to the Legislature.

I concur in the judgment, and I also concur in the opinion of Chief Justice WALLACE.

Mr. Justice McKINSTRY delivered the following dissenting opinion, in which Mr. Justice NILES concurred:

A writ of mandate was allowed by the District Court, commanding the defendants to issue bonds according to the provisions of "An act to provide road funds for the counties

of San Luis Obispo and Santa Barbara," approved March 18, 1874.   (Stats. 1873–4, p. 436.)

Section one of the act "empowers and requires" the board of supervisors of each of the counties named in the title to issue bonds to the amount of twenty thousand dollars, bearing interest, and in sums not less than five hundred and not more than one thousand dollars each.

Sections two, three and four relate to the form of the bonds.   Section five provides that the board of each county must levy a special tax each year to pay interest on the bonds outstanding; section six requires of them to levy each year after 1874, an additional tax sufficient to pay ten per centum on the whole issue, and section seven provides for the redemption of the bonds.

Section eight directs that the board shall sell the bonds, after notice, to the person bidding the highest price in gold or notes, not less than ninety cents on the dollar.   The board is given power, however, "to reject any or all bids," and is authorized to sell, without notice, for any price, not less than ninety-six cents on the dollar in gold.

The ninth section of the act treats of the disposition of the money derived from the sale of the bonds, and provides: First. That the money received by Santa Barbara County "shall be expended in the manner the supervisors of that county may deem best for the improvement of the main roads and thoroughfares of the county."   Second. Of the money "derived to San Luis Obispo," that the treasurer thereof shall set apart twelve thousand dollars, which shall be known as the "Cuesta Road Fund," and shall be expended under direction of the county surveyor "in laying out and constructing a wagon road by the grade known as the Harris grade, over the Cuesta or Sierra of San Margarita, leaving the present public road at or near the farm of Juan Noe, on the south, and coming to the same at or near the Cervantes Place on the north side of the mountain." (This subdivision of the ninth section also provides for the drawing of warrants by the county auditor in favor of the surveyor, in such sums as the latter may require during the progress of the work, and "in order that no delay may oc-

cur," commands the county treasurer immediately to transfer one-half of the general road fund to the Cuesta road fund, to be repaid out of the proceeds of the sales of bonds.) Third. That the remainder of the money "derived to San Luis Opispo County, under the provisions of the act, shall be exclusively used and appropriated by the Board of Supervisors of said county, in improving, in such manner as they may deem best, the main road from San Simeon Bay to the Paso de Robles Hot Springs, and the main road from the town of San Luis Obispo to the Bay of San Luis Obispo."

I. The act cannot be construed in such manner as to deprive the supervisors of San Luis Obispo of all discretionary power in the matter, as well of issuing and selling the bonds as of disposing of the proceeds, without bringing the statute into conflict with the provision of the Constitution: "The Legislature shall establish a system of county and town governments, which shall be as nearly uniform as practicable throughout the State."

The laws in operation previous to the passage of the act, gave to the boards of supervisors discretionary power (to be exercised exclusively, but not always within the same limits) over the whole matter of all public roads and highways, which were to be paid for by the people of the respective counties; including the power of determining what roads should be made or repaired, what sums—within the maximum fixed by law—should be raised for highways and roads, and how they should be expended. I am not prepared, nor is it necessary, to say that the Legislature had theretofore established a system in other respects uniform; but the system existing when the act under consideration was passed—however it might otherwise lack uniformity—conferred everywhere discretionary power on the county boards in respect to roads and highways. The existing uniformity would be deranged were the act construed as mandatory and as compelling the Board of Supervisors of San Luis Obispo to borrow a certain sum, and apply it to particular roads.

The words "system of county governments" of them-

selves imply the generic character of the county organizations which it was intended should be established, but the phrase "which shall be as nearly uniform as practicable throughout the State," seems to have been added to remove all possible doubt of the intention that the county governments should be everywhere substantially the same.*

I shall assume, for the purposes of this decision, that all the counties of the State might be compelled to borrow money to build or repair certain roads, or be deprived of choice or option in respect to the levy of taxes for road purposes, and the application of such taxes; that this might be the substitution of one uniform system for another. But the act of March 18, 1874—if construed as mandatory—is destructive of the uniformity of a system in a particular in which the Legislature has declared it to be practicable to establish uniformity, and has in fact established it.

It may be urged that the section of the Constitution only requires such uniformity as is "practicable," and whether it is practicable to have the county governments uniform is a political and not a judicial question.

This suggestion has already been answered by the Supreme Court of Wisconsin.

The Constitution of Wisconsin contained a clause like that in our own. In *State* v. *Riorden* (24 Wis. 484), the Supreme Court of that State held that a statute providing for a board of *eight* supervisors in a certain county, which, under the general statutes relative to county governments, would have only *three*, was in conflict with the constitutional provision. And in *State* v. *Milwaukee* (25 Wis. 339), it was decided that a statute appointing commissioners "to superintend, etc., the erection of a court-house in Milwaukee County"—a matter under the general law left with the

---

* The county *governments* were intended to be uniform. It was argued at the bar that there was no warrant in the Constitution for the suggestion that such governments may be abolished or permanently suspended, or that a county government may be emasculated by depriving its governmental functionaries of all control over the county affairs or over any *county matters*. It is not necessary, however, to adopt so broad a proposition in this case.

supervisors—was invalid by reason of the same provision of the Constitution.

In the former case the court said: "The provision not only requires that the system established shall be one system—that is, that all the counties organized shall be invested with the same general powers of local government, delegated to them, and have the' supervisor system of government, if that be the one adopted—but likewise that this system shall be as nearly uniform as circumstances will permit. * * * It was further designed to prohibit special legislation. If legislative uniformity in the system, as far as practicable, was enjoined, then the evils which grow out of the present act, and of other similar acts, would be avoided." It was urged there, as here, that the words "as nearly uniform as practicable," showed that the provision of the Constitution was "directory," and not mandatory; one addressed only to the judgment of the Legislature, whose decision as to what is and what is not practicable cannot be subject to review. But the court said: "We do not think this whole matter rests in the discretion of the Legislature. When the Legislature has established a system of county and town government, substantially uniform throughout the State, it may be conceded that its action is final upon the matter. The courts, in such case, would not attempt to review the action of the legislative body, and decide whether it might not have perfected a system more nearly uniform. But when a law, like the one before us, breaks the uniformity of a system already in operation, it seems to us that it is a proper exercise of judicial power to declare that the act is void, because it departs from the rule of uniformity which the Constitution enjoins." (24 Wis. 490, 491.) And in the latter case (25 Wis. 347) the court said: "That it is not a uniform system to provide that in one county the power to build the county buildings shall be vested in special commissioners selected by the Legislature, while in other counties the same power is vested in boards of supervisors elected by the people, is obvious. It is equally obvious that it is not as uniform as practicable, because it is self-evident, that this power might be vested in the county

boards in all the counties. Independent of the act it was so vested in fact. There was, under the existing law, complete uniformity. The same board was clothed with the same general powers of county government in all the counties. A confession that such uniformity was not only practicable, but actually existed, is implied by the very enactment of this act; for its sole object was to change that state of things, and to withdraw from the county board of Milwaukee County a portion of the powers which it previously held in common with all the other boards of the State."

Like the clause, "All laws of a general nature shall have a uniform operation" (Sec. 11, Art. I), the provision as to the organization of counties and towns was intended to prevent *special* legislation. The requirement that a uniform system should be adopted, may, perhaps, be considered as simply "directory," since it demanded affirmative action. But when the Legislature established a system the duty was imposed on the courts, whenever the question properly arose, of declaring null any palpable attempt to set aside the uniformity of the system, to the extent that it was uniform.

The reasoning of the Supreme Court of Wisconsin on this point is eminently satisfactory, and is applicable to the statute now before us. We are not called on to say whether a more uniform system could have been established than that which was in existence when the act of March 18, 1874, was passed. That was a matter for the legislative department. But as the Legislature had decided that a certain uniformity was practicable, and as it appears to us to be practicable, and to have existed when this statute was enacted, we are bound to hold void an attempted exception to that uniformity. Unless we are prepared to say that the supervisors of San Luis Obispo are less competent to determine what roads shall be built, repaired and paid for by the people of their county, than the supervisors of other counties, we cannot assert that uniformity with respect to conferring such powers on the county boards is impracticable.*

---

* The question above considered has never been passed on in this State, nor is it referred to in any previous decision of this Court.

It is by no means a necessary consequence of what has been said, however, that this statute shall be held to be wholly *void*.

The act "empowers" the board to issue the bonds, etc. It may be admitted that the powers of all the boards of supervisors throughout the State need not be restricted within precisely the same limits, or employed in precisely the same mode, because no system purporting to be uniform in all respects has ever been adopted. But the county roads and highways must remain under the control of the supervisors (at least until another general and equally uniform system has stripped all of them of such control), because the roads and highways within the counties have been placed under their control by a system uniform in that particular. The Board of Supervisors of San Luis Obispo, therefore, it may be assumed, could be empowered, and were empowered, to do all that the act in question purports to authorize.

The word "required," in the first section, may be rejected in accordance with the principle that part of a statute may be held unconstitutional, and the rest valid, unless it appear that the Legislature would not have approved the portion which they had power to enact, *disconnected* from that which is *void*. Indeed, it may be laid down as a rule, in this class of statutes, that where the word "shall" is used, it should ordinarily be construed to be the equivalent of "may." Words imperative should be interpreted as permissive, in order to give all possible effect to the intention of the Legislature.

It may be assumed, therefore, that if the defendants had voluntarily proceeded to issue and negotiate the bonds, they would have constituted valid obligations, binding on the county of San Luis Obispo.

But in this proceeding the court was asked to *compel* the board to issue the bonds. Surely, we should examine very closely the claim that any court in this State possesses the extraordinary power of compelling the people of a county— by judicial process—to create a debt contrary to their wish and to that of the local authorities, and for an object uni-

formly placed by the system of county governments within the control of these authorities.

The result of such examination on my part is the conclusion that the board cannot, by means of mandamus, be compelled to issue the bonds.

II. If the act shall be construed as commanding the Board of Supervisors of San Luis Obispo County to issue the bonds, the board has also, by the terms of the statute, the power "to reject any and all bids;" that is, to refuse to sell the bonds. It would be a vain judgment to direct that the county should be put to the expense of printing the bonds, if the board cannot be compelled to sell them.

In America the writ of mandamus, although the power to issue it is derived from statutes, so far partakes of the nature of a prerogative writ that the court has the power to issue it or withhold it, in the exercise of a judicial discretion. (Moses on Mandamus, 18.) When, if issued, it would manifestly be attended with hardship and difficulty, the court may, and even should, refuse it. (*Ex parte Fleming*, 4 Hill, 581.) As the board has the power to refuse to sell the bonds, it would be a hardship on the county, and confer no advantage on the real plaintiff, to order that they be printed and signed.

I think the judgment should be reversed.