State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

THE STATE EX REL. MARINETTE, TOMAHAWK & WESTERN RAIL-
WAY COMPANY, Appellant, vs. THE COMMON·COUNCIL OF
THE CITY OF TOMAHAWK, Respondent.

*March 22 — April 30, 1897.*

*Municipal corporations: Aid to railroads: Consent, how given: Consti-
tutional law: Tomahawk city charter: Repeal of general law by
implication: Limit of indebtedness: When obligation accrues: As-
sessment: Division of school district: Apportionment of debts.*

1. The provision of sec. 946, R. S., that the acceptance by a munici-
pality of a proposition for subscription to the stock of a railroad
company and the issuance of bonds in payment thereof may be
given by the signatures of a majority of the resident taxpayers,
without a submission of the question to the electors, is valid, and
such consent when so given creates a contract binding upon the
municipality.

2. Sec. 3, subch. IX, of the charter of the city of Tomahawk (ch. 58,
Laws of 1891) provides that "no debt shall be contracted against
the city . . . unless the same shall be authorized by a majority
of all the members-elect of the common council," and that "the
common council shall not, in any case, or under any pretext, or
for any purpose whatever, contract debts or liabilities of any kind,
name, or nature, exceeding the amount which it is authorized by
the charter to levy for the current year." Secs. 12, 15, subch. V,
provide that the council shall manage and regulate the finances
and levy all taxes. Sec. 11, subch. IV, provides that, in addition
to the amount of taxes for general city purposes, special taxes may
be levied for certain purposes "of public utility," provided such
special taxes shall first have been recommended by the council and
afterwards approved by a vote of the people. Sec. 19, subch. XIII,
authorizes the council to issue bonds of the city, not to exceed five
per cent. of the assessed valuation, for such public improvements
as shall be authorized by ordinance of the council adopted by a
vote of three fourths of its members, the issuance of such bonds to
be approved by a vote of the people. *Held,* that these provisions,
construed together, are not at variance with, and do not by impli-
cation repeal, the general law relating to municipal aid to railroads
(secs. 945 *et seq.,* R. S.),— sec. 3 of subch. IX being applicable only
to debts for ordinary municipal purposes, and sec. 19, subch. XIII,
being an affirmative provision merely, which does not prevent the

city from exchanging its bonds for stock of a railroad company up to the prescribed limit, when a valid contract therefor is made under the general law. *Perrin v. New London*, 67 Wis. 416, distinguished.

3. Although the amendment to sec. 3, art. XI, Const., limited the amount of indebtedness which a city might incur, yet the power and duty of the legislature remained to impose other restrictions or regulations; but the sufficiency of such restrictions being a question within the discretion of the legislature, its action in the premises is not reviewable by the courts.

4. Under sec. 948, R. S. (providing that no corporate bonds issued in exchange for railroad stock "shall be delivered, or be valid if delivered," until the road shall have been actually completed and in operation), no indebtedness on the part of the municipality can be said to have been incurred, within the meaning of sec. 3, art. XI, Const. (prohibiting municipalities from becoming indebted in any manner in excess of five per cent. of the value of the taxable property therein, "to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness"), until the road is completed in the prescribed manner.

5. The assessment intended as the basis of determining whether a municipal indebtedness is in excess of the five per cent. limit imposed by said sec. 3, art. XI, Const., is the last assessment of the municipality as equalized by the local board of review for the purposes of general taxation.

6. In determining whether a proposed issue of municipal bonds is in excess of the constitutional limit of indebtedness, all forms of indebtedness must be included except warrants for money actually in the treasury and contracts for ordinary expenses within the current revenue.

7. Where a city before its incorporation formed part of a school district, no part of the indebtedness of such district should be reckoned as an obligation of the city, in determining whether its constitutional limit of indebtedness has been reached, unless such indebtedness is shown to have been legally apportioned between the city and the district.

APPEAL from a judgment of the circuit court for Lincoln county: CHAS. V. BARDEEN, Circuit Judge. *Reversed.*

This was a proceeding to obtain a peremptory writ of *mandamus* to compel the common council of the city of *Tomahawk* to cause subscription to be made, on behalf of

said city, on the books of the said railway company, for shares of the capital stock thereof, equal to $9,000, and to pass and enact an ordinance or resolution directing and requiring the mayor and city clerk to sign, seal, and issue on behalf of said city, and deposit in escrow with J. W. Ladd, cashier, etc., as trustee, municipal bonds of said city of *Tomahawk* in a like sum, running to the said railway company as payee, bearing interest at the rate of six per cent. per annum, etc., and directing said Ladd to deliver said bonds to the relator company upon the finishing and completing of its railroad from said city to a point in section 34, township 35 N., of range 8 E., and the passage of cars over the same on or before December 1, 1895, upon a contemporaneous delivery to said city of such certificates of shares of the capital stock of said railway company; and, further, that said common council, prior thereto, enact an ordinance or resolution directing an annual levy of taxes in said city, in addition to all other taxes, sufficient to pay the interest annually growing due on said bonds, and also to pay and discharge the principal thereof by the time the same shall be due, according to their terms. A return was made to the alternative writ, and the issue was tried before the court, upon which there was a finding of facts, not excepted to, and, as a conclusion of law, that the relator had no right to the relief asked. Judgment was given dismissing the proceeding, with costs, from which, when perfected, the relator appealed.

The relator founds its right to relief upon proceedings under the general law in relation to issuing corporate bonds for the purpose of paying for an authorized subscription to the stock of the railroad company. R. S. sec. 942, and following sections. The relator submitted a proposition to the clerk of the city, pursuant to sec. 945, which was filed October 13, 1894. The formalities required by sec. 946 were observed, and December 17, 1894, the relator filed with the common council a petition, signed by the requisite number

of resident taxpayers. At the time of the commencement of the present proceedings, the relator had commenced, and during their pendency had seasonably completed, the road. On the 21st day of January, 1895, the relator requested the common council to cause subscription to be made for stock to fulfill the contract so made, and to execute and issue the bonds, etc., in order to carry it out, and tendered full performance of such contract on its part. Defendant neglected and refused to issue the bonds, and assigned as reasons for so doing: First, because such bonds could not be lawfully issued, under the charter of the city of *Tomahawk*, incorporated March 25, 1891 (ch. 58, Laws of 1891); second, because, with the existing indebtedness of the city, the proposed bond issue would make such indebtedness exceed the constitutional five per cent. limit; third, because the law authorizing the issue of the bonds is unconstitutional.

It was found by the court:

(5) That the assessed valuation of the taxable property of the city for the year 1894, fixed by the board of review of the city, was the sum of $444,549.50, and that the value of the taxable property of said city, as fixed and determined by the county board of Lincoln county, at its meeting November 15, 1894, pursuant to sec. 1073, R. S., was $485,545.

(6) That on the 12th of November, 1891, the city issued its municipal bonds, known as "waterworks bonds," in the sum of $15,500, bearing interest at the rate of six per cent. per annum, which were purchased and held by the state of Wisconsin at their par value. That there was unpaid on said bonds, between October 13 and December 17, 1894, the sum of $12,500, principal, and interest thereon at the rate aforesaid from November 12, 1893; and that $1,500 of the principal and one year's interest on the total unpaid principal became due November 12, 1894. That December 3, 1894, the common council made the following tax levies, among others, for the then ensuing year: Waterworks bonds, $1,500;

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

interest on the same, $660; bridge tax, $1,200; incidentals, $2,000; school fund for all purposes, $8,996.50; borrowed money, $2,500. That said taxes were collected after December 17, 1894, and the said sum of $1,500 above mentioned, and $660 for interest on the same, was paid to the state treasurer in February, 1895, and a further payment on the said bonds of $1,500 principal, and annual interest for the year ending November 12, 1895, was made on the day last named.

(7) That the board of school directors of the town of Rock Falls, Lincoln county, borrowed from the state, May 17, 1889, $6,665, to be repaid in annual instalments of $666.50 each, payable February 1st of each year, with interest at six per cent. per annum; and that December 17, 1894, there was unpaid on said indebtedness the sum of $2,666 of principal, with interest from May 17, 1894, and no more; and that $666.50 of principal and one year's interest became due February 1, 1895, prior to the commencement of this action. That, by request of the officers or agents of the board of school directors of Rock Falls, the county clerk of Lincoln county each year certified to the city clerk of the city of *Tomahawk* (the territory of which was taken from the town of Rock Falls) the amount of the state tax levied by the state of Wisconsin in the years 1892, 1893, and 1894, and certified by the secretary of state to the said county clerk, to pay the instalments of said debt and interest which became due February 1, 1893, February 1, 1894, and February 1, 1895, and taxes had been levied on the taxable property of the city of *Tomahawk* for the purpose of paying a proportion of said indebtedness. These, with other facts, were relied on as tending to show the assumption of a certain proportion of said debt by said city.

(8) That on November 23, 1894, the city borrowed of W. H. and J. W. Bradley $2,500, to be repaid with interest at seven per cent. within ninety days, and a promissory note therefor had been given by the proper authorities of the

city, and the item of $2,500 for borrowed money, in the tax levy already mentioned, was for the purpose of repaying said loan, which in fact was paid February 21, 1895.

(9) That on the 28th of November, 1894, the city was indebted to the Rice River Lumber Company in the sum of $175, for lumber to be used by the said city in repairing its streets, but this bill was paid January 21, 1895, and the city had at all times sufficient funds in its possession to pay the same.

(10) That on December 3, 1894, the common council levied on the taxable property of the city, for state and county taxes, the amount of $5,420.91, which was collected and paid to the county treasurer of Lincoln county in March and April, 1895.

(11) That in December, 1894, and prior to the 17th day of said month, the city had entered into a contract with S. M. Hewitt & Co. and the town of Rock Falls to build a bridge across the Wisconsin river, between the city of *Tomahawk* and the said town of Rock Falls, and that the city should pay for building said bridge, as its share, the sum of $1,200. That Hewitt & Co. entered upon the performance of said contract prior to the 17th day of December, and completed the same prior to the commencement of this proceeding; and the city paid said sum to Hewitt & Co., in February, 1895, from a tax levy for the payment of that sum December 3, 1894.

(12) That the city had entered into two contracts with one Garland for the extension of the waterworks system of the city, one made July 23, 1894, and the other September 25th of the same year; and that they were performed about the 11th day of December, 1894. That on the 17th of December, 1894, prior to the filing of the petition signed by resident taxpayers, the city paid to said Garland the balance due him under said contracts, and had at all times on hand funds available for that purpose, sufficient to pay all amounts

to accrue to him under said contracts as the same became due.

(13) That on December 11, 1894, the common council appropriated, out of funds then in the treasury, the sum of $400 for the erection of a pesthouse; and on December 29, 1894, city orders to the amount of $400 were issued to certain contractors who had been employed by said committee to construct said pesthouse, said contractors having commenced work on the same, December 14, 1894.

(14) That in the summer of 1894, one Sykes prepared plans and specifications for waterworks extension, for which he filed a bill for $64, which was disputed, but it was compromised January 1, 1895, and paid at the sum of $50; but the city had at all times on hand sufficient funds available to pay such demand.

(15) That prior to the 16th of November, 1894, the city contracted for the services of certain teachers in the city schools, by which they were to work at a stated price per month, the contract being good from month to month, and for no greater period; and under said contracts there became due to the teachers, December 21st, wages for the month ending on said day in the aggregate of $620, and on the same day said sums were paid to them by said city; the amount earned up to the 17th day of said month being $513.39. All the wages of teachers prior to said month had been paid as the same became due from month to month, there having been sufficient money in the treasury applicable to that purpose to pay them as the same became due.

It was further found that there had not been any vote of the electors or resident taxpayers of the city for the proposition to grant aid to the relator for the purposes mentioned in the petition, nor any vote whatever to issue bonds or subscribe for stock of the relator for that purpose, except as stated in said petition and acceptance by the taxpayers; that the common council never voted to accept said propo-

sition or subscribe for the capital stock of the relator, nor did it ever in any manner "authorize or direct the issue of bonds to the relator, in any sum whatever, for any purpose, or for the creation of any indebtedness against the city, by reason of the proceedings had and taken by the relator and the resident taxpayers, as before stated."

For the appellant there were briefs by *Curtis & Reid*, and oral argument by *Geo. Curtis, Jr.*, and *A. H. Reid*.

For the respondent there was a brief by *Henry C. Hetzel*, *Brown & Pradt*, and *James O'Leary*, city attorney, and oral argument by *Mr. Hetzel* and *Mr. Neal Brown*. They contended, *inter alia*, that a charter or special act passed subsequent to a general law repeals the latter so far as it is in conflict or inconsistent with it. Dillon, Mun. Corp. (4th ed.), § 88; 23 Am. & Eng. Ency. of Law, 422; Id. 430, and cases cited in note 4; *Isham v. Bannington Iron Co.* 19 Vt. 240; *State v. Clarke*, 14 Am. Rep. 471; *State v. De Bar*, 58 Mo. 395; *State v. Binder*, 38 id. 451; *Palmer v. State*, 2 Oreg. 66; *Tierney v. Dodge*, 9 Minn. 166; *Richardson v. Sheldon*, 1 Pin. 624; *Titcomb v. Union F. & M. Ins. Co.* 8 Mass. 326; *St. Johnsbury v. Thompson*, 59 Am. Rep. 731; *Excelsior Petroleum Co. v. Lacey*, 63 N. Y. 422; *In re Snell*, 58 Vt. 207; *Van Denburgh v. Greenbush*, 66 N. Y. 1; *Gowen v. Harley*, 6 C. C. A. 190; *State v. Stoll*, 17 Wall. 425. The legislative power in municipalities cannot be delegated to any other authority. It must be exercised by the municipality, either through the action of the whole body of electors, or through officers representing them. *Slinger v. Henneman*, 38 Wis. 504; *State ex rel. Att'y Gen. v. O'Neill*, 24 id. 149; *Post v. Pulaski Co.* 49 Fed. Rep. 628; *Mills v. Charleton*, 29 Wis. 400; *People ex rel. McLean v. Flagg*, 11 Am. L. Reg. (N. S.), 80, note; *People ex rel. McCagg v. Chicago*, 51 Ill. 17, 2 Am. Rep. 278; *People ex rel. Board of Park Comm'rs v. Common Council of Detroit*, 28 Mich. 228, 15 Am. Rep. 202; *People ex rel. D., W. & P. R. Co. v. Batchellor*, 53 N. Y. 128, 13 Am. Rep. 480;

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

*Atkins v. Randolph,* 31 Vt. 226; *Harrington v. Plainview.*
27 Minn. 224; *Plainview v. W. R. Co.* 36 id. 505.

PINNEY, J.   1. The validity of subscriptions to the stock
of railroad companies, and the issue of bonds in payment
therefor, by towns, cities, and counties, when authorized by
law, has in this state long been settled (*Phillips v. Albany,*
28 Wis. 357), and that it is not necessary that the question
of subscribing for stock and issuing such bonds be submitted
to a vote of the qualified electors of the town, city, or county.
The legislature may confer directly the necessary authority,
for such purposes, on the proper town, city, or county au-
thorities to represent and act for the municipal corporation
or organization. · *Thompson v. Lee Co.* 3 Wall. 327; *Rail-
road Co. v. Otoe Co.* 16 Wall. 677.   A proposition submitted
on behalf of the railroad company, and properly accepted
on behalf of the municipality, as by a vote of its electors,
becomes a contract mutually binding (*Bound v. W. C. R. Co.*
45 Wis. 543; *Platteville v. G. & S. W. R. Co.* 43 Wis. 493);
and the municipal authorities may be compelled to issue
the bonds if the contract has been performed on the part of
the railway company (*State ex rel. G. B. & M. R. Co. v.
Jennings,* 48 Wis. 549).

It is contended, however, that the legislature could not
lawfully provide that the assent of the municipality may be
given by a majority of the signatures of the resident tax-
payers, as specified in the statute, so as to bind it and render
the contract obligatory on the city; that such consent could
only be given by the body of electors, or through boards or
officers elected by them according to law.   The provision
for giving the assent of the municipality by the signatures
of a majority of the resident taxpayers has been in force for
a period of nearly twenty-five years, and the question be-
comes extremely important, in consequence of the great
interests depending upon it, rather than from any intrinsic

difficulty involved in its decision. Various acts of a similar character, for issuing bonds on the vote or petition of *tax-payers, taxable electors, or freeholders*, have been passed, and some of them put in use. P. & L. Laws of 1853, ch. 165, sec. 2; P. & L. Laws of 1856, ch. 132, sec. 7; Id. ch. 502, sec. 7; P. & L. Laws of 1858, ch. 162, sec. 4; Id. ch. 138, sec. 6; Laws of 1861, ch. 65, sec. 2; Laws of 1865, ch. 378, sec. 2; Laws of 1866, ch. 21, sec. 1; P. & L. Laws of 1871, ch. 287, sec. 1; Id. ch. 263, sec. 1. In 1872 the present act was passed (Laws of 1872, ch. 182, revised by ch. 289, Laws of 1873), and subsequently carried into the revision of the statutes in 1878 (secs. 945 *et seq.*).

The validity of a contract perfected in the manner stated has been frequently determined in the courts of several states, and so uniformly sustained that the question may, perhaps, be properly said to have been put at rest by contemporaneous legislative and judicial exposition. We have not been referred to, nor are we aware of, any provision of the constitution which forbids, expressly or by implication, the legislation relied on; but the argument against it resolves itself substantially into the position that the right of local self-government and the spirit of the constitution are opposed to it. Plenary power in the legislature, for all purposes of civil government, is the rule, and prohibition to exercise a particular power is an exception; and it is for those who rely on such exception to point it out. *People ex rel. Wood v. Draper*, 15 N. Y. 541. The making of such a contract and the issuing of bonds under it is regarded as the exercise of the power of taxation, for it can only be fulfilled by a resort to taxation, and its validity necessarily depends upon the power to levy the tax. Taxes are understood to be burdens or charges imposed by the legislature upon persons or property, to raise money for public purposes. Cooley, Const. Lim. *479. In *Loan Asso. v. Topeka*, 20 Wall. 660, it was said by MILLER, J., "that a decided preponderance of

authority is to be found in favor of the proposition that the legislatures of the states, unless restricted by some special provisions of their constitutions, may confer upon municipal bodies the right to take stock in corporations created to build railroads, and to lend their credit to such corporations; also to levy the necessary taxes on the inhabitants and on property within their limits subject to general taxation, to enable them to pay the debts thus incurred." In all these cases the decision has turned upon the question whether taxation to pay such obligations was for a *public* purpose, and in this state this question was long since put at rest, as already stated. Counties, cities, and towns are public agencies, created with certain powers of local government, and with certain general powers for the better and more effectual exercise of the powers of the state government. Their existence is recognized by the constitution, but they are subject to the constitutional control of the legislature. *Levy Court v. Coroner*, 2 Wall. 501; *Board of Comm'rs of Hamilton Co. v. Mighels*, 7 Ohio St. 109; *People ex rel. Wood v. Draper*, 15 N. Y. 541; *Cheaney v. Hooser*, 9 B. Mon. 333; *Gorham v. Springfield*, 21 Me. 58; *Bank of Rome v. Rome*, 18 N. Y. 43. Taxation is essentially and wholly a legislative power, and while certain powers of taxation have been conferred on these local organizations, and local public officers chosen therein, there still remains in the state a reserved power of taxation, with authority on the part of the legislature to provide for its exercise, for public purposes, in such other manner as the legislature may prescribe, not forbidden by the constitution. The power to tax is universally acknowledged to be the strongest and the most pervading of all the powers of the government. In *Mills v. Charleton*, 29 Wis. 400–411, it was said by Dixon, C. J., that "the taxing power, when acting within its legitimate sphere, and unrestrained by positive constitutional provisions, is a far-reaching and unlimited power, which knows no stopping place nor mod-

eration of force until it has accomplished the purpose for which it exists."

The city, in this case, was a mere creation of the legislative power. It possessed no inherent power of taxation, and only such as the legislature conferred on it. The validity of the contract in question must necessarily depend upon the will of the state. Hence how the consent of the city should be given, whether by city officers, resident taxpayers, or by vote of its electors, was clearly a matter wholly in the discretion of the legislature, and, when given in the manner prescribed, a valid contract was created, and the performance of such contract by the city became, by reason of such consent, obligatory on the city. R. S. sec. 948; *State ex rel. G. B. & M. R. Co. v. Jennings*, 48 Wis. 549. This is in accord with the decisions of many of the most respectable courts in the country. *Duanesburgh v. Jenkins*, 57 N. Y. 177, 189–194; *Williams v. Duanesburgh*, 66 N. Y. 140, 141; *Bennington v. Park*, 50 Vt. 195; *People ex rel. Blanding v. Burr*, 13 Cal. 343, 357–359; *Queensbury v. Culver*, 19 Wall. 84; *Bernards v. Morrison*, 133 U. S. 523; *Scipio v. Wright*, 101 U. S. 665; *Van Hostrup v. Madison City*, 1 Wall. 291; *Woods v. Lawrence Co.* 1 Black, 404, 405; *Mercer Co. v. Hacket*, 1 Wall. 83; *Mentz v. Cook*, 108 N. Y. 504, 509; *Rich v. Mentz*, 134 U. S. 632, 644. The vesting of the power to consent to such a contract in the resident taxpayers, so deeply interested in the enterprise and in the public welfare of the city, and who are to contribute of their means to pay the debt incurred, is clearly much more judicious and conservative than to provide that it shall be given by the qualified electors. There is no provision in the constitution which, either expressly or impliedly, forbids the legislature to authorize the taxpayers of the town, city, or county, to represent it and act for it in making a contract in relation to "something new and unusual, not constituting any part of the ordinary general powers of such local organizations,

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

like that of isuing bonds in aid of railroads, sustained in *Sheboygan Co. v. Parker*, 3 Wall. 93." Per PAINE, J., in *State ex rel. Keenan v. Milwaukee Co.* 25 Wis. 351. In *Single v. Marathon Co.* 38 Wis. 372, it was said by LYON, J., that, "were the question a new one, I apprehend it would not be difficult to show .that the purchasing of stock by towns or counties does not pertain to the system of town and county government, and hence that special acts of the legislature conferring powers to do so are not within the constitutional provision under consideration," requiring a uniform system of town and county government. It is firmly established in the cases already cited that the making of a subscription to the stock of railroad companies, and issuing bonds in payment therefor, are transactions not within the scope of the purposes for which towns, cities, or counties are created. They have no authority, it is clear, to make such contracts, in the absence of some special enabling act authorizing the same.

.2. The general law under consideration was in force at the time the city charter (Laws of 1891, ch. 58) was enacted, and it undoubtedly applied to cities that might thereafter be incorporated, as well as to those in existence at the time, unless repealed by implication. No express repeal is relied on. There is no repugnancy between the general law and the city charter. They respectively apply to different subjects, namely, the former to matters not within the ordinary scope and purpose of the city charter, and the latter wholly to matters of strictly municipal administration. The restrictions contained in the charter against contracting debts are, as a matter of fair implication, to be limited to the contracting of debts for strictly municipal purposes. It is well settled that repeals by implication are not to be favored, and "where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court (no purpose to repeal being clearly expressed or indi-

cated) is, if possible, to give effect to both. In other words, it must not be supposed that the legislature intended, by a later statute, to repeal a prior one on the same subject, unless the last statute is so broad in its terms, and so clear and explicit in its words, as to show that it was intended to cover the whole subject, and therefore to displace the prior statute." *Frost v. Wenie,* 157 U. S. 46–58; *U. S. v. Tynen,* 11 Wall. 88–93; *Henderson's Tobacco,* 11 Wall. 652; *Red Rock v. Henry,* 106 U. S. 596–601; *King v. Cornell,* 106 U. S. 395, 396. In all such cases we ought to seek such construction as will reconcile them together. *Attorney General ex rel. Taylor v. Brown,* 1 Wis. 525. The rule, as thus stated, is in accordance with the general result of the authorities on the subject. Each chapter must prevail as to its own subject matter (*Woodbury v. Shackleford,* 19 Wis. 55; *Schieve v. State,* 17 Wis. 253), and special provisions relating to a particular subject control general ones to which they are repugnant (*Western Bank v. Tallman,* 17 Wis. 530). Upon well-settled rules, considering the scope and object of the two statutes, there is no necessary conflict or inconsistency in their provisions, and both, therefore, may well be held operative as to the city of *Tomahawk.*

The provisions of sec. 4986, R. S., to the effect that all the laws contained in the Revised Statutes "shall apply to, and be in force in each and every city and village in the state, so far *as applicable and not inconsistent* with the charter of any such city or village; but when the provisions of any such charters are *at variance* with the provisions of the Revised Statutes, the provisions of such charters shall prevail, *unless a different intention be plainly manifested,*"—lead to the same result, namely, that, where the provisions of the general law are not inconsistent or at variance with the charter, the provisions of each will be construed to be operative as to all matters within its purview.

There is no reason, therefore, for reading the general law

into the city charter. It applies wholly to matter untouched by the charter, and the provisions of the general law and the statute, not being inconsistent, may well subsist and be executed together; for we think that the provisions of the charter, relied on by the defendant, cannot properly be considered as a restriction of the power of the city to issue bonds in exchange for the stock of a railway company, under the general law. The charter provisions are that "the common council shall have authority, by ordinances, resolutions, or by-laws, to manage and regulate the finances," and "to adopt all legal and requisite measures for levying taxes and assessments, general and special" (Laws of 1891, ch. 58 [City Charter], subch. V, sec. 12); that "the common council of said city shall, by proper resolution, levy all taxes to be raised in said city, itemizing the amount so as to show the amount raised for general and special purposes" (sec. 15, subch. V); that, "in addition to the amount of taxes for general city purposes, special taxes may be levied for the purchase of fire engines, cemetery grounds, public squares, and lands for railway purposes, including depots, switch yards, side tracks, and such other purposes as are of public utility; but no such tax shall be levied, unless the same shall first be recommended by the common council, and afterward submitted to a vote of the people, and approved by them," etc. (subch. IV, sec. 11). This provision seems to limit and explain the one which follows, and to show that it extends only to debts or liabilities of any kind, name, or nature, for general municipal purposes, namely, that "no debt shall be contracted against the city, or certificate of indebtedness be drawn upon the city treasury, unless the same shall be authorized by a majority of all the members-elect of the common council," etc.; "*provided*, that the common council shall not, *in any case, or under any pretext, or for any purpose whatever*, contract debts or liabilities of any kind, name, or nature, exceeding the amounts which it is authorized by the provisions of this act *to levy*

*for the current year."*   Subch. IX, sec. 3.   By subch. XIII, sec. 19, the common council has authority "to issue bonds of said city for such public improvements as shall be duly authorized by said common council by ordinance," adopted by a vote of three fourths of its members, but not to exceed five per cent. of the assessed valuation, etc.; the issuing of the bonds to be submitted to and approved by a vote of the people.   This is an affirmative statute merely, and does not prevent the city from exchanging its bonds for stock of the railroad company, up to the prescribed limit, should a valid contract therefor be made under the general law.   It is a provision to secure public city improvements.   The construction and effect of these various provisions of the charter is to be arrived at by considering them together and in their relation to municipal purposes and the ordinary administration of the affairs of the municipality.

The case of *Perrin v. New London,* 67 Wis. 416, is much relied on by the respondent as showing the invalidity of the contract in question, but we think that the cases are distinguishable.   In *Perrin v. New London,* 67 Wis. 417, the charter declared that said village should have no power; except when specially authorized thereunto by law, to borrow money, etc., "nor shall said *village* incur any debt or liability, in any year, greater than the amount of tax allowed by this act to be raised in said village in the year in which such debt or liability was incurred."   In 1872, when the bonds there in suit were issued, the charter conferred no authority upon the village, or its trustees, to raise money by taxation to pay such bonds in that or any other year, and the special act of 1867 (ch. 93, P. & L. Laws of 1867), under which the bonds in suit were issued, contained no provision for levying a tax to pay the principal of the bonds, but only annual interest thereon.   The limitation in that case was on the power of the *corporate body,* and the court proceeded upon the theory that the bonds would be void unless there

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

was in the charter, or in the special act, authority to levy a tax to pay them. Here we think that by the fair construction of sec. 3, subch. IX, ch. 58, Laws of 1891, relied on, the limitation was only *upon the common council*, in contracting debts for ordinary *municipal* purposes. The section provides, in substance and effect: (1) That no such debt shall be contracted, unless authorized by a majority of all the members-elect of the common council, the vote to be entered by ayes and nays; and (2) the proviso to the section limits the power of the common council, so that it should not "in any case, or under any pretext, or for any purpose whatever, contract debts or liabilities of any kind, name, or nature, exceeding the amounts which it is authorized by the provisions of this act to levy for the current year,"— showing that the entire section is a restraint only on the common council. The provision in the charter for issuing bonds, not to exceed five per cent. of the assessed valuation, for public improvements, and in the manner stated by subch. XIII, sec. 19, shows that the first limitation was not absolute, but was to have only the force and meaning already stated. Consequently, the power of the city, under the general law, by consent of its resident taxpayers, to make the contract in question, as well as the power of the city to issue bonds for public improvements, still remained, notwithstanding the provisions of sec. 3, subch. IX. In *Perrin v. New London, supra,* the prohibition was unqualified, and its broad general meaning was neither explained, modified, nor controlled by other provisions, as here, in the same or other sections of the charter. The proper rule of construction in such cases is recognized in *Perrin v. New London,* and in *Quincy v. Cooke,* 107 U. S. 549, and *Quincy v. Jackson,* 113 U. S. 332–336. The application and meaning of sec. 3 of subch. IX of the city charter, for the reasons indicated, must be restricted to debts for strictly municipal purposes.

3. The constitutional amendment to sec. 3, art. XI, pro-

viding that "no city . , . shall be allowed to become indebted in any manner, or for any purpose, to any amount, including *existing* indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness," was a sufficient limitation of the amount of indebtedness that might be contracted so as to satisfy the provisions of sec. 3, art. XI; but the power and duty of the legislature remained to impose still other restrictions or regulations, and several such have been imposed by the general law under consideration. R. S. secs. 942–947. Whether the power of the municipal corporation to tax, to borrow money, to contract debts, and lend its credit, has been sufficiently restricted, is understood to be a question within the discretion of the legislature; and its action in the premises is not reviewable in the courts. *Bank of Rome v. Rome,* 18 N. Y. 38. Some of the provisions in the city charter which have been considered are restrictions on the power of the city, in these respects, as to debts of a strictly municipal character.

4. The proposition submitted to the resident taxpayers, and accepted by the signatures of a majority of them, the statute declares, "shall be deemed obligatory as a mutual agreement on such company and on such municipality; . . . and the common council of such municipality shall, as soon as may be, cause subscription to be made on the books of such company for such stock or bonds thereof as were proposed to be issued, and shall provide by ordinance or resolution for issuing such bonds of the municipality, in accordance with such agreement, by the proper officers, and the deposit of the same in escrow, if it be so agreed;" and it had been so agreed in this case. "But no such bonds shall be delivered, or be valid if delivered, until the road, to aid in the construction of which such bonds were voted, shall have been completed and in operation by the passage

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

of cars continuously from one terminus to such point as such
company shall have agreed to construct the same, in con-
sideration thereof." [R. S. sec. 948.] By the amendment
to sec. 3, art. XI, of the constitution, it is provided that "any
city . . . *incurring* any indebtedness" as stated, in such
amount, "shall, before doing so, provide for the collection
of a direct annual tax, sufficient to pay the interest on such
debt as it falls due, and also to pay and discharge the prin-
cipal thereof within twenty years from the time of contract-
ing the same." The contract is one for creating an indebt-
edness on the part of the municipality, upon conditions
precedent, namely, the completion of the road and the legal
capacity of the city at that time to become indebted on the
bonds held in escrow. The phrases "incurring such in-
debtedness," and "incurring any indebtedness as aforesaid,"
manifestly refer to the time when the contract is performed
by the act of the company and it is entitled to the delivery
of the bonds; and they must receive such construction as
will be consistent with the nature of the transaction and
effectuate the intention of the parties. To incur an indebt-
edness is to become liable for or subject to an indebtedness.
The incurring of the indebtedness in the present case consists
of several steps or proceedings, under the statute, resulting in
the putting of bonds in escrow which are not to be delivered,
or be valid if delivered, until the road is completed as stip-
ulated. This is evidently the point at which the indebted-
ness is legally consummate. In *Keystone Lumber Co. v.
Bayfield*, 94 Wis. 491, it was held that no tax could be levied
to pay interest on bonds held in escrow, to be delivered in
aid of a railroad at its completion, but which had not been
completed. Interest could not accrue on bonds until they
should become legal obligations for the payment of the sum
named therein, and it must logically follow that the time of
the accruing of the indebtedness is the time stipulated for
the delivery of the bonds. We think, therefore, that by the

"last assessment for state and county taxes previous to the incurring of the indebtedness" is intended the last assessment in the municipality, as equalized by its board of review, next before the time fixed for the completion of the road and the delivery of the bonds. The record does not give this date, but as the road was to be completed by December 1, 1895, it is a fair inference from the pleadings and finding that it was completed by that time. The assessment intended by the constitutional provision· is the assessment of the town, city, or village, as equalized by its board of review, made for the purposes of general taxation, and there is no other assessment, within the meaning of this provision, "for state and county taxes." The so-called "state assessment" is made on the third Monday of May, before the local assessments are made, and "from all the sources of information accessible to the board, as a means of apportioning state taxes between the several counties." A valuation of the property in the several counties is thus arrived at. R. S. sec. 1069. At the annual meeting of the county board in November, the local assessments, having been completed in the meantime, with statistical statements, are laid before the county board, and it is then "to determine and assess the *relative* value of all the taxable property in each town, city, and village," as a means of apportioning the state and county taxes between such towns, cities, and villages; but the taxes therein are computed and extended upon the local assessments, as determined by the local assessors and boards of review. The object of the provision, by which resort is · to be had to the "last assessment for county and state taxes," is to prevent a resort to special assessments, which the legislature might authorize for the purposes contemplated in the amendment only, and as a safeguard against possible evasion of its true intent and purpose. There is no assessment distinctively made for county ʻtaxes, nor any distinctively made for state taxes, in any other sense than has been stated;

and to hold that there are such would be to render the pro-vision indefinite and uncertain as to which so-called "assess-ment" was intended. The last assessment of the town, city, or village as fixed by the local board of review, upon which county and state taxes may be extended, as well as local taxes, is clearly the assessment intended. R. S. secs. 1073, 1076, 1078.

5. In order to ascertain the amount of the indebtedness of the city existing at the time the railroad was completed and the bonds were required to have been delivered, so as to de-termine whether, after deducting such indebtedness from five per centum on the assessment of 1895, as equalized by the city board of review,— that being the limit of indebted-ness the city has power to contract, under the amendment to sec. 3, art. XI, of the constitution,— the city had power to issue the bonds in question, not only municipal bonds, but all forms of city indebtedness, must be deducted, except warrants for money actually in the treasury and contracts for ordinary expenses within the current revenue. In *Earles v. Wells*, 94 Wis. 285, where this question was fully consid-ered and discussed, it was held that "so long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury and the cur-rent revenues collected or in process of immediate collection, the municipality may be fairly regarded as doing business on a cash basis, and not upon credit, even though there may be for a short time some unpaid liabilities. But the mo-ment an indebtedness is voluntarily created 'in any manner or for any purpose,' with no money nor assets in the treas-ury, nor current revenues collected or in process of imme-diate collection, for the payment of the same, that moment such debt must be considered in determining whether such municipality has or has not exceeded the constitutional limit of indebtedness." It follows, therefore, that the amount of water bonds outstanding at the time of the completion of

State ex rel. Marinette, T. & W. R. Co. vs. Tomahawk Common Council.

the road, for the payment of which no certain and adequate provision had been made from the funds in the treasury or from any tax in process of immediate collection, would have to be deducted, but not the amount of state and county taxes levied on property in the said city, nor any part of the loan from the state of Wisconsin to the board of school directors of the town of Rock Falls, in Lincoln county. The facts found did not justify the conclusion that the city is indebted in any sum on account of such loan. No statute authority has been shown for apportioning said indebtedness between said city and the board of school directors of the town of Rock Falls, and, if any exists, no such apportionment of such indebtedness appears to have been made. In the absence of any such showing, the indebtedness for that loan is the indebtedness only of the corporation contracting it, and the facts found do not justify the conclusion that the city is indebted in any sum whatever on account thereof. All other items of alleged city indebtedness were either paid before December 1, 1895, or there were sufficient funds and resources in the city treasury to discharge the same in the course of current administration of the financial affairs of the city.

The judgment of the circuit court dismissing the proceedings herein upon the ground that the contract made by the relator with the city for the issue of bonds and subscription to its capital stock was null and void, is erroneous and must be reversed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.