COFFIN et al. v. BOARD OF COM'RS OF KEARNEY COUNTY.

(Circuit Court, D. Kansas, First Division. April 18, 1902.)

No. 7,893.

1. **SUBROGATION—HOLDERS OF INVALID BONDS.**

Where a county undertakes to fund its outstanding indebtedness into bonds, and on issuing such bonds, payable to bearer, takes up, cancels, and destroys the warrants evidencing such indebtedness, and the bonds are bought in the open market, and are afterwards repudiated by the county, and are held by the court to be void, for want of power at the time in the county to issue them, the purchaser of the bonds for a valuable consideration, on offering to surrender them to the county, is entitled to be subrogated to the rights of the original warrant holders, and to recover from the county the amount of the warrants. Irvine v. Commissioners (C. C.) 75 Fed. 765, followed.

2. **STATUTE OF LIMITATIONS—INVALID BONDS—ACTION ON ORIGINAL CONSIDERATION.**

The statute of limitations does not begin to run against such suit until denial by the county of its obligation on such bonds; and the action of the county commissioners of such county in adopting a resolution recognizing the obligation of the county on the warrants, and directing the funding of the debt into bonds, is tantamount to a new acknowledgment, and stopped the running of the statute of limitations.

3. **ACTION ON COUNTY BONDS—BURDEN OF PROOF.**

Where the defendant county undertakes to defeat recovery on such warrants on the ground that they were fraudulently issued or were a nudum pactum, the burden of proof rests upon the county to establish such facts. It is not sufficient to defeat a recovery that the evidence should show, in a general way, that the county commissioners were recklessly extravagant, or that they issued warrants for questionable purposes, or even in greater amounts than were honestly owing by the county; but the proof must go further, and identify the particular warrants in suit with such illegal transactions.

4. **SAME—EVIDENCE.**

Where the defendant county offers in evidence its county record for the purpose of identifying the warrants in suit, with the numbers entered in such record, and it appears on the face thereof that there have been erasures and substitutions of certain numbers, and additions of other numbers on the outside of the marginal lines of the record, to make out the correspondence of such numbers with those of the warrants in suit, and such tampering with the record is unexplained by the official custodian of such record, and other entries in such record, to eke out the essential identity, are carried forward, out of consecutive order, many hundred pages, to the latter part of the record, not signed by the proper officers of the county as by statute required, such part of the record should be excluded.

5. **SAME—COUNTY WARRANTS.**

What purports to be a "stub book" of the county, introduced by the defendant for the purpose of identifying by the stubs some of the warrants in suit (such book not being required by the statute to be kept by the county, and it appearing that such book had for a considerable time been in the possession of a person other than the official custodian

of the county records and files, and by him carried about over the country, and not identified by the proper officer of the county as of the records or files of his office), is incompetent evidence on behalf of the county.

6. SAME—DEFENSES.

The defense to such warrants that they had been issued in excess of the statutory limitations of the amount of debts for current expenses of the county for the given year, based upon the assessed valuation of the taxable property of the county, is not maintainable as a complete defense to all the warrants in suit, in the face of the agreed statement of facts that in the county, newly organized, there had been no assessment of the property for purposes of taxation anterior to the issue of the warrants. *Held*, further, that inasmuch as the law contemplates that in the administration of a territory, like a township, preliminary to its organization into a county, special, extraordinary expenses, distinguished from "current expenses" in the conduct of an organized county, are legally permissible, it devolves upon the defendant county to show affirmatively what particular warrant in suit was issued on account of such current expenses, and what particular warrant is in excess of the statutory limitation.

7. EVIDENCE—OFFICIAL CERTIFICATES.

A certificate made by a person designated as an "enumerator" appointed by the governor of the state to report to him the minimum number of inhabitants and the taxable property in the county, for the information of the governor preparatory to the issue of a proclamation by him designating the given territory as an organized county, is inadmissible in evidence to show the assessed valuation of the taxable property of the county in this suit.

8. SAME.

Equally incompetent for such purpose is a compilation of the taxable property of the county found in the published reports of the state auditor; likewise a certificate of the clerk of the county, found in the state auditor's office, giving the valuation of property in the county, claimed to have been furnished when said bonds of the county were presented to the state auditor for registration; there being no statute of the state then in force authorizing such registration or certificate, and no evidence that the original warrant holders or bondholders, or purchasers of the bonds, presented such certificate to the state auditor, or had any knowledge thereof. There can be no presumption that such certificate was presented by either of such persons, in the absence of a statute requiring its presentation.

(Syllabus by the Court.)

In Equity.

Rossington, Smith & Histed and F. P. Lindsay, for complainants. Milton Brown, for defendant.

PHILIPS, District Judge. It is strenuously urged by defendant's counsel that the complainants are not entitled to the relief sought by their bill, as the doctrine of the right of substitution forbids it. This question was passed upon by Judge Foster, the then presiding judge of this district, on a demurrer interposed by the defendant to the bill of L. M. Irvine, similar to the complainants'. His opinion is reported at page 765, 75 Fed. On coming into this jurisdiction under assignment, it is a part of the unwritten law that I should not overrule that ruling, unless it be so clearly erroneous as to appeal to my sense of judicial duty. It is to be confessed that looking to the broad language of Mr. Justice Miller in Ætna Life Ins. Co. v. Town of Middleport,

124 U. S. 534, 8 Sup. Ct. 625, 31 L. Ed. 537, the proposition might be upheld that inasmuch as the purchasers of the bonds bought them on the open market, on speculation, or as an investment, they stand in the relation to the debtor county as mere volunteers, to whom equity does not extend its arm of protection by substituting them to the rights of the original warrant holders. And unless the language of his postulates can be "restrained to the fitness of the matter," it would preclude recovery in this case. The facts of that case can be differentiated from these at bar. The statute under which the appropriation was voted by the town of Middleport to the railroad company provided as the means for its payment a tax on the property of the inhabitants, and not otherwise. No power was given to the municipality to issue bonds therefor. The contract was not an unconditional obligation of the municipality to pay. The railroad company, as the beneficiary of the appropriation, could look alone for payment to taxes to be collected annually from the inhabitants. No other judgment could have gone against the municipality, as such, to enforce this obligation, than of a mandatory character against its governing body to proceed to assess and collect the necessary taxes, sub modo. So when the railroad company took the bonds it paid to the city nothing nor surrendered to it therefor anything of value. Neither was the debt thereby attempted to be extinguished or altered, or the mode of its enforcement in anywise affected. Therefore, even as between the railroad company, to whom the bonds were issued, and the city, no equity was evoked to entitle the railroad company to appeal to a court of equity for relief. Not so in the case at bar. The debt was the direct obligation of the county. The warrants presumptively represented value received and enjoyed directly by the county. The taker of the bonds did surrender something of value to the county,—the warrants, the written evidence of the undertaking of the county. The warrants the county canceled and burned, and undertook thereby to wipe out the written evidence of its original debts. The bonds being void, the warrants, although physically destroyed, remained the obligations of the county; and, on repudiation by the county of the bonds, if then owned by the warrant holders, the latter, beyond question, could have maintained action to recover the amount thereof from the county. By issuing the bonds the county put it in the power of the taker of the bonds to transfer them by delivery, and obtain the amount of his debt against the county. The purchasers of the bonds have no recourse on the person from whom they purchased, as he transferred them simply for what they appeared on their face to be,—commercial paper,—without any guaranty. Otis v. Cullum, 92 U. S. 447, 23 L. Ed. 496. The warrant holders, having realized their money by the sale of the bonds, have no occasion to go on the county for pay of the warrants. Therefore, if the defendant's contention is to prevail, that the complainants are not entitled to be subrogated, the situation presents this anomaly: The county, by the trick or scheme of issuing the bonds, and having the warrants surrendered for cancellation, and then repudiating the bonds, is to be forever discharged from its debts represented by the warrants, aggregating about $35,000 and interest. The complainants, whose money the warrant holders were thus, by the

act of the county, enabled to obtain, have no standing in court to compel the original warrant holders to pursue the county for their use and benefit. So the county is to go free. It is difficult for the human mind to conceive of a situation more rank with injustice; and, if the courts cannot afford relief to these complainants, it must be said that justice no longer, in American jurisprudence, has a "forum of conscience." As said by that other great jurist, Mr. Justice Field, in Marsh v. Fulton Co., 10 Wall. 676–684, 19 L. Ed. 1040:

"The obligation to do justice rests upon all persons, natural and artificial: and, if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation."

In the face of such a contingency as this case presents, the very instinct of justice should compel a chancellor to make a precedent. The motto of the device of the pickax on the dial, "Find a way or make one," should be applied at times by the courts.

The fact that the money paid by the complainants for the bonds to the original bondholders did not pass directly into the treasury of the county cannot avail the defendant as a defense. As said by the court of appeals of this circuit in Geer v. School Dist., 49 C. C. A. 539, 548, 111 Fed. 682–690:

"The case of City of Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238, is authority for his [complainant's] recovery, notwithstanding the fact that his assignor actually paid the money to the school district for the bonds in question. The court holds in the last-cited case that the holder of the bonds, who purchased them from the original taker, succeeds to the same right of recovery on the implied obligation which the original purchaser from the municipality enjoyed."

This ought the more especially to obtain under circumstances like these at bar, where the bonds were exchanged by the county in an attempted liquidation of its outstanding warrants, which it had authority to issue, and were issued, presumptively, for valid obligations of the county, and, after obtaining them under agreement, canceled and destroyed them.

The Statute of Limitations. It is conceded that under the Kansas statute this cause of action would not be barred until after the lapse of five years. When did the cause of action as to these complainants arise? The contention of the defendant is that the statute began to run the moment the funding bonds were issued. It is then assumed that the bonds were issued August 1, 1888; and as this suit was not instituted until August 14, 1893, the limitation had expired. But the agreed statement is that on August 27, 1888, the board of county commissioners of Kearny county, at a regular meeting of said board, passed the resolution acknowledging the indebtedness on the warrants, and ordering the bonds to be issued in exchange therefor, whereupon the county treasurer should cause the surrender of the evidence of indebtedness to be marked "Paid in full" across the face. The bonds were to be accompanied with a certificate from the county clerk under his seal, "that the indebtedness of Kearny county in registered warrants equal to the sum of such bond or bonds has been surrendered to the board of county commissioners for cancellation, and canceled." Paragraph 2 of the agreed statement of facts recites that "subsequent-

ly, and in pursuance of the order set forth in paragraph No. 1, the chairman of the board of county commissioners and the county clerk executed refunding bonds of said county of Kearny." The bonds necessarily were issued after the date of the funding order. Defendant's counsel has fallen into error respecting the date of the issue, by reason of the recitation that the bonds should be dated back to August 1, 1888, to bear interest therefrom. The taker of the bonds could have had no action growing out of or dependent thereon until after the issue and delivery of the bonds. The correct rule is that until the county repudiated the bonds, by denying liability thereon, the statute of limitations would not begin to run against the bondholder to recover from the county the value of the warrants exchanged therefor, and destroyed by the county. Cowper v. Godmond, 9 Bing. 748; Merrill v. Town of Monticello, 72 Fed. 462–464, 18 C. C. A. 636. As said by the court of appeals in Geer v. School Dist., 49 C. C. A. 549, 111 Fed. 691:

"As long as the district so recognized the same, and elected to treat them as legal obligations, we know of no reason requiring the plaintiff to take any steps to rescind the contract, or obligating him to resort to the courts to enforce the implied obligation. It would be a harsh and thoroughly impracticable rule to establish that the holder of a claim against a municipality is bound by any consideration of statutes of limitations to take steps to rescind an express contract to pay the same, as long as the municipality itself recognizes such express contract as a valid and binding obligation. The effect of such a rule would be to permit the municipality to lull the holders of its obligations into inaction, and thereby, taking advantage of its own wrong, deprive them of a valuable right. It results, in our opinion, that the plaintiff in error had a lawful right to institute suit to recover upon the implied obligation at any time within six years [which was the limitation under the Colorado statute] after the district repudiated the express obligation. As the agreed statement recites that the suit was brought on the bonds July 5, 1890, when payment was resisted, in the absence of any evidence showing an earlier denial by the county of liability the presumption must obtain that the answer to that suit marks the initial period for the running of the statute of limitations. Furthermore, by resolution of the board of county commissioners of August 27, 1888, they acknowledged the existence of the debt,—that they owed the sum of the warrants,—and proceeded to discharge the warrants by thereafter issuing said bonds. Under statutes of limitation in no material respect different from that of Kansas (Gen. St. Kan. 1897, p. 90, § 18), it has been held (and such is the trend of the adjudications) that it is sufficient if the party acknowledge that he owed the debt, to stop the running of the statute of limitations, even though unaccompanied by any promise to pay. Chidsey v. Powell, 91 Mo. 622, 4 S. W. 446, 60 Am. Rep. 267; Elder v. Dyer, 26 Kan. 604, 40 Am. Rep. 320; Rolfe v. Pilloud (Neb.) 19 N. W. 615, 970; Sluby v. Champlin, 4 Johns. 462; Patterson v. Choate, 7 Wend. 441; Whitney v. Reese, 11 Minn. 138 (Gil. 87); Palmer v. Gillespie, 95 Pa. 340, 40 Am. Rep. 657; De Forest v. Hunt, 8 Conn. 180. So, in this view of the law, this acknowledgment of the debt having been made by the defendant on the 27th day of August, 1888, and the suit having been instituted on August 14, 1893, the period of limitation had not run."

At the hearing of this case, at the conclusion of the oral argument then presented by counsel it was suggested by the court to defendant's counsel that: Conceding there was some irregularity and fraud in the issue of the warrants in question, the practical and essential question is, has the defendant traced such fraud or want of consideration into any of the warrants involved in this suit? and

suggested to counsel for defendant that he present, in some tangible, intelligible form, a statement pointing out this required identity. This he has attempted to do in subsequent briefs. But I confess my inability to find the satisfactory proofs, outside of the mere assertions and cunning arrangement of figures by counsel. It stands alike to authority and to a sense of justice that, before the defendant can avoid a single warrant sued on, the burden rests upon it to show, by intelligible and honest testimony, that the particular warrant is vitiated by fraud in its issue, or that it is a nudum pactum. Board of Com'rs of Lake Co. v. Keene Five Cents Sav. Bank, 108 Fed. 505, 47 C. C. A. 464.

The defendant has sought to identify some of these warrants, and the purposes for which they were issued, by offering in evidence certain pages of the commissioners' journal, No. 1, of Kearny county. To the admission of this journal for such proof, complainants' counsel objected, for the reason, inter alia, that the material pages of this record bear upon their face unmistakable evidence of having been tampered with. It must be admitted that it is quite apparent on the face of this record that there have been material erasures and substitutions of figures denoting the number of the warrants, evidently made since the original record was made up. It is also apparent (particularly so on pages 53 and 58 of this journal, which purports to contain a list of the county warrants ordered destroyed and refunded into bonds) that not only have the numbers of the original writing thereon been changed, but that after the entries were made there have been added two columns of figures on the left-hand margin, and one column of figures on the right-hand margin, outside of the lines which separate the margins from the usual place for making record entries. Superadded to this is the fact that this enumeration of numbers of warrants was wholly insufficient to indicate either their amounts, or names of the payees, or the purposes for which they were entered; and after their entry, and apparently in fresher ink, occur the words, written in, "See commissioners' journal, page 605, for full description." Why, if this entry was ordered made at the time of the purported transaction, it was not made in consecutive order on the record, but had to be carried over 547 pages to the back of the book, is not explained. And even then all the entries necessary to make out the numbers of the warrants canceled and destroyed were not entered on page 605, but a part of them were entered on page 604, bearing unmistakable evidence of not having been entered at the time; and these later pages are not signed, as required by the statute, by the officers of the court, or officially attested. No sufficient evidence is offered by the defendant in explanation of the evident tampering with this record.

Aside from this criticism, there is nothing in this record proper to identify any warrant in question with any fraud in its issue, or to show what the original consideration therefor was. Encountering this obstacle in the defense, recourse was sought by defendant to the testimony of one Waterman, and a certain stub book presented by him, known as "Exhibit Y," purporting to have contained

scrip or warrants issued by Kearny township; the stubs in some instances indicating to whom issued. No chancellor, who distrusts a self-seeking hypocrite, can place any reliance upon the uncorroborated word of this witness. From statements made by defendant's counsel in open court, it appears that this man, in other litigation between this county and other creditors, involving questions as to the issue of county warrants and county indebtedness, gave his deposition or depositions, not making the developments he undertakes to disclose in this case in respect to said stub book and other matters. And counsel assigned as a reason for asking for a delay to take further depositions that this witness had of late, at a religious revival, experienced a change of heart. But when on the hearing of this case it was developed that this witness had entered into a solemn compact, of record, with the defendant county, to assist it in getting up evidence in this case, in consideration of $600 to him since paid, the conclusion is enforced that his confession is merely a needful exhibition of that unselfishness "which is but a lively sense of favors yet to come." It is by this witness that the defendant must rely for the identification of this stub book as of the files of Kearny township. The objection by complainants' counsel to the admissibility of this book in evidence is well taken. In the first place, there was no statute of the state requiring such a book to be kept by the township or county officials; second, no officer of the township or of the county who would have been the official custodian of this book has sufficiently identified it as of the records or files of the township or county; and, third, it appears from Waterman's testimony that, for a long period of time after this book is claimed to have been used by the officers of Kearny township, it was in his private possession, carried about by him outside of the state, and at other places in the state, hundreds of miles away from Kearny county. From every consideration of sound policy, such a book cannot be introduced by the county as evidence in its behalf. Board of Com'rs of Lake Co. v. Keene Five Cents Sav. Bank, supra; State v. Cook, 30 Kan. 82, 1 Pac. 32; State v. Nye, 32 Kan. 201, 4 Pac. 134; Phelps v. Hunt, 43 Conn. 194; White v. Fitler, 2 Pa. Law J. 302; Hardin v. Blackshear, 60 Tex. 132; Alexander v. Campbell, 74 Mo. 142; Roberts v. Wilson, 1 Utah, 292; Noble v. Douglass, 56 Kan. 92–95, 42 Pac. 328. The defendant cannot eke out the omissions, imperfections, and want of identity between the numbers of the warrants and the parties to whom issued, not shown by the stub book, by the testimony of Waterman in pais. If the book, indeed, be a record or file of the county proper, it must speak for itself. This rule is inflexible when such evidence is produced for the purpose of carrying home notice as to the character and consideration of warrants of a county to the payee or the purchaser. Rollins v. Board, 90 Fed. 575, 33 C. C. A. 181. Sending Waterman and his "stub book" out of court, as in law and good conscience ought to be done, the defense should go with them.

The remaining defense worthy of consideration is that the warrants sued on were an overissue, beyond the debt-making power

of the county, and are therefore invalid. The statute relied upon is section 1853, Gen. St. Kan. 1901, in force at the period in question:

"The board of county commissioners of any county shall not levy upon the taxable property of such county a tax for current expenses of said county of any one year in excess of the following amounts: Upon a valuation of five million dollars and under, one per cent.; over five millions and under six millions, eight and one-half mills; over six millions and under seven millions, seven and one-half mills; over seven millions and under eight millions, six and one-half mills; over eight millions and under nine millions, five and three-fourths mills; over nine millions, one-half of one per cent.; provided, that the electors of the county, by a direct vote, may order an increase in such levies."

The succeeding section (1854) limits the power of issuing warrants within the prescribed limit of section 1853.

It hardly admits of debate that the evidence of the assessed valuation of the property of the county contemplated by this statute is that made by the proper county officers, made and extended upon the tax books of the county for the purpose of collecting taxes. No taker or purchaser of the issued obligations of a county, acknowledging an indebtedness, has ever been held, to my knowledge, to the duty of looking further than the record books of the county containing the assessment and tax levy. Aside from this, however, by paragraph No. 12 of the defendant's answer herein it is expressly admitted:

"That said warrants referred to in complainants' bill, if issued at all, were made and issued against the county fund of said county, and as a charge against the county fund, before there had been any assessment of taxable property of said county for the purpose of taxation, and before there had been any levy of taxes for county purposes in said county."

No matter what other allegations the answer may contain respecting the present assessments on the valuation of the county property, the foregoing admission of the answer should preclude all attempts made by the defendant to show aliunde that there had been such an assessment and valuation on the property of the county prior to the issue of these warrants. "A party should be bound by the allegations of his pleadings, deliberately made, and cannot be allowed to obtain benefits from contradictory and inconsistent allegations therein, even if made in separate counts." Losch v. Pickett, 36 Kan. 216, 12 Pac. 822. This rule is aptly stated in Savings & Trust Co. v. Bear Valley Irr. Co. (C. C.) 112 Fed. 694–704: "A party is not permitted to assume inconsistent positions in the same litigation." It should also be a sufficient answer to the attempts, by extraneous matters, to show what the assessed valuation of the taxable property of the county was, to say that all of these should be supplemented by evidence showing that either all of the warrants, or some of the particular warrants in suit, were issued "for current expenses of said county of any one year" in excess of the statutory limitation. As warrants issued by the county for special and extraordinary expenses of the municipality (especially those incident to the administration of the affairs of a new township and the organization of a new county) are not within the inhibited limitation of the statute (Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651, 32 L. Ed. 1060; Childs v. City of Anacortes (Wash.)

32 Pac. 217; State v. Cornwell, 18 S. E. 184, 40 S. C. 26; Germania Sav. Bank v. Town of Darlington, 27 S. E. 846, 50 S. C. 337; State v. Common Council of City of Tomahawk, 71 N. W. 86, 96 Wis. 73), it devolved upon the defendant to show not only that the particular warrants in suit were issued for current expenses of the county, but also that at the time of their issue the statutory limit had been passed. This the evidence fails to sufficiently point out and fix with any degree of certainty. The state of the proof in this case defies any mental effort, pursuing permissible legal lines, to ascertain this required quantity.

The astute and industrious counsel for defendant has sought in many ways to supply this needed and indispensable proof. His first effort was to introduce in evidence the contents of a report made by one Prouty, as the enumerator designated by the governor of the state under the state statute (Sess. Laws 1887, c. 128), made for the purpose of enabling the governor of the state, preliminary to issuing the proclamation declaring the new county organized, to determine whether the county contained the minimum population and taxable property. Neither the original nor a certified copy of this report was offered in evidence, but the defendant's counsel claimed that it was in his possession, and had been lost. Waiving, however, any question about this proof, how can it be judicially maintained that such certificate by such enumerator, made for a limited and single purpose, can be used by the county, in a suit against it by a third party, to show what the assessed valuation of the property of the county was? At common law it would be the merest hearsay evidence, and as there is no statute of the state making such report evidence for any purpose, except for the information of the governor before issuing his proclamation declaring the county organized, this paper is clearly inadmissible.

The next evidence, and of like character, offered by the defendant, is a certified copy made by the auditor of state of what purports to be a certificate filed in his office by the county clerk of Kearney county in November, 1888, to secure the registration of the bonds. It is conceded that at the time of making this certificate to the state auditor there was no statute of the state requiring the registration of bonds issued by counties, and consequently no statute authorizing or requiring such certificate by the clerk. And consequently it could not be evidence of notice of its contents to the holders of county warrants. The contention, however, of counsel, is that, inasmuch as the holder of the bonds presented such certificate to the auditor, he is bound by its recitals. In the first place, there is no evidence before this court that such certificate was presented to the auditor by the then holder of the bonds; and, in addition to this, the proof fails to connect the complainants with said certificate. If, as counsel contends, such certificate was presented to the auditor by the then holder of the bonds, they were presumably in the hands of the party who exchanged the warrants therefor; and, as the alleged object of the registration of the bonds was to qualify them for circulation upon the markets as commercial paper, not only would the further presumption arise that they had passed out of the hands "of the holder" onto the market, but this presumption ripens into an admitted and indisputable fact by the

agreed statement of facts filed herein by the parties. By the fourth paragraph of this agreed statement it is stipulated:

"That the complainant, subsequent to the issuance and delivery of the bonds described in paragraph No. 2, to wit, on January 10, 1889. bought the same upon the market, in good faith, paying par therefor, without notice of any irregularities or defect, or claim of illegality, save and except such as might be imparted from the face of the bonds themselves, and the public records and laws of Kansas; and complainant has continued to be, and is now, the owner and holder of said bonds."

The clear import of this statement is that the complainants bought the bonds after they had gone through the office of the auditor, as they would not go "upon the market" until after the holder of them had thus, according to his notion, qualified them for the public market. This is confirmed by the express stipulation that the complainants took the bonds without notice of any irregularities or defect or claim of illegality, "save and except such as might be imparted from the face of the bonds and the public records and laws of Kansas." As there was no law of Kansas authorizing or requiring such registration or such certificate, the contents of such paper is but hearsay, inadmissible against a third party in a suit against the county. Authorities supra. It was an unauthorized, superserviceable preparation of the clerk, and as such it is in no sense such a record of the county as a taker or purchaser of its obligations should take notice of. There is no evidence in this case that said certificate was presented to the auditor by any warrant holder. And even if this certificate were competent evidence, it would leave the defendant's cause precisely where all of its other evidence stops,—short of pointing out which warrant is bad by reason of being an overissue. Counsel for defendant contents himself with the bald statement that "it is easily ascertainable that there was an overissue of warrants, and it is easily computable as to the amount thereof." Yet notwithstanding he has been industriously engaged for the past year in this task, he finds it easier to leave the court to work it out, or guess at it, than furnish the demonstration.

In its last extremity the defendant has offered in evidence, on page 350 of a bound book labeled on the back, "Sixth Biennial Report, Auditor State, 1888, Kansas," which purports to give the valuation of properties returned by the county clerks, and the total valuation of the property fixed by the state board, and the per centum to be collected. And in the same connection he offered by his testimony to show what was a copy of a certain certificate found in the printed record of another case (Speer v. Board, 32 C. C. A. 101, 88 Fed. 749), from which it appears that the valuation of the railroad property had not been changed by the board of equalization, but remained as originally assessed by the state board of railroad assessors. So that this evidence, even if competent, would not show what was the assessed valuation of the railroad property admitted to then be in the county, and would therefore leave the court to presume something which the evidence does not show. I undertake to say that no well-considered adjudication can be found holding that in determining the question of whether or not there was an overvaluation of property for assessment purposes,

when the county issued certain evidences of indebtedness, such proof could be made by recourse to the state auditor's report, made up by him from sources and papers themselves not in evidence. It is not such a record as the law contemplates that the taker of the county's obligations should examine before taking or purchasing its warrants.

Other defenses interposed by the defendant in this case are precluded by the rulings of the court of appeals in the case of Speer v. Board, supra, and therefore need not be reviewed.

While the court, from all the facts and circumstances connected with the history of Kearny township, cannot escape the conviction that there was in the administration of its affairs by the township officers wanton extravagance, fraud, and peculation, and while the court would cheerfully see the county relieved of the great burden of debts placed upon it by improvident, if not dishonest, officials, it cannot do so against established rules of evidence and of law. There are facts and circumstances presented by the evidence on behalf of the defendant, for instance, which point pretty directly to fraud on the part of the township board, and their aiders and abettors, in employing a large number of men to work upon the construction of a public road through the township, with the ulterior purpose of colonizing such employés in the township to vote at an election for the location of a county seat for the new county. But as the evidence shows such employés did much and valuable work in the construction of this road, which the statute of the state authorized the township board, in its discretion, to have done, even if the evidence in this case showed that the sum of the warrants issued for such services was excessive, and that some of the warrants could on such account be defeated for want of consideration, or because of fraud in their issue, the defendant's evidence again falls short of identifying any particular warrant in controversy with such fraud or overissue. The same may be said respecting the large amount of fees for attorneys' services for which warrants were issued. While the defendant's testimony raises a reasonable doubt as to the value of such services being equal to the amount of compensation allowed by the governing board, I am unable, from the evidence presented, to identify such warrant or warrants with those in suit; and, if I could, it would be mere guesswork for this court, on the evidence before it, to undertake to determine what amount of such warrant was honest, and how much was dishonest, or reasonable or unreasonable. The board had authority to employ counsel, which it did; and, as such counsel unquestionably rendered some professional service, the presumption obtains that every warrant issued therefor was not voidable for total failure of consideration.

Decree will go for the complainants.